**AMERICAN INTERNATIONAL GROUP, INC., CONSOLIDATED DERIVATIVE LITIGATION.**

**American International Group, Inc., Plaintiff,**

v.

**Maurice R. Greenberg and Howard I. Smith, Defendants.**

**C.A. No. 769–VCS.**

Court of Chancery of Delaware.

Submitted: April 20, 2009.
Decided: June 17, 2009.

---

Stuart M. Grant, Esquire, Megan D. McIntyre, Esquire, John C. Kairis, Esquire, Christine M. Mackintosh, Esquire, Catherine Pratsinakis, Esquire, Grant & Eisenhofer P.A., Wilmington, DE, for Teachers' Retirement System of Louisiana and Co-Lead Counsel for the Plaintiffs.

Peter C. Harrar, Esquire, Stacey T. Kelly, Esquire, Wolf Haldenstein Adler Freeman & Herz, LLP, New York City, for City of New Orleans Employees' Retirement System and Co-Lead Counsel for the Plaintiffs.

A. Gilchrist Sparks, III, Esquire, S. Mark Hurd, Esquire, Samuel T. Hirzel, Esquire, Morris, Nichols, Arsht & Tunnell, LLP, Wilmington, DE, for American International Group, Inc.

Daniel J. Kramer, Esquire, Paul, Weiss, Rifkind, Wharton & Garrison, LLP, New York City; Stuart L. Shapiro, Esquire, Shapiro Forman Allen Sava & McPherson, LLP, New York City, of counsel for American International Group, Inc.

F. Michael Parkowski, Esquire, Michael W. McDermott, Esquire, Michael W. Arrington, Esquire, Parkowski, Guerke & Swayze, P.A., Wilmington, DE, for Defendant Maurice R. Greenberg.

Nicholas A. Gravante, Jr., Esquire, Robert J. Dwyer, Esquire, Amy L. Neuhardt, Esquire, Boies, Schiller & Flexner, LLP, New York, City; David Boies, Esquire, Boies, Schiller & Flexner, LLP, Armonk, NY, of counsel, for Defendant Maurice R. Greenberg.

Sean J. Bellew, Esquire, Cozen O'Connor, Wilmington, DE, for Defendants ACE Ltd., ACE USA, Inc., ACE INA Holdings, Inc. and Susan Rivera.

Stephen A. Cozen, Esquire, George M. Gowen, III, Esquire, Cozen O'Connor, Philadelphia, PA; H. Lee Godfrey, Esquire, Neal S. Manne, Esquire, Johnny W. Carter, Esquire, Jeremy J. Brandon, Esquire, Susman Godfrey, LLP, Houston, TX, of counsel for Defendants ACE Ltd., ACE USA, Inc. and ACE INA Holdings, Inc.

Richard J.J. Scarola, Esquire, Alexander Zubatov, Esquire, Scarola Ellis, LLP, New York City, of counsel for Defendant Susan Rivera.

Thad J. Bracegirdle, Esquire, Wilks, Lukoff & Bracegirdle, LLC, Wilmington, DE, for Defendants Marsh & McLennan Companies, Inc., Marsh, Inc., Marsh USA Inc. and Marsh Placement Inc.

Gregory P. Joseph, Esquire, Douglas J. Pepe, Esquire, Sandra M. Lipsman, Esquire, Gregory P. Joseph Law Offices, LLC, New York City, of counsel for Defendants Marsh & McLennan Companies, Inc., Marsh, Inc., Marsh USA Inc. and Marsh Placement Inc.

David A. Jenkins, Esquire, Smith Katzenstein Furlow, LLP, Wilmington, DE, for Defendants General Re Corporation and General Reinsurance Corporation.

George M. Garvey, Esquire, Fred A. Rowley, Jr., Esquire, Lika C. Miyake, Esquire, Munger, Tolles & Olson, LLP, Los Angeles, CA, of counsel for Defendants General Re Corporation and General Reinsurance Corporation.

David C. McBride, Esquire, Christian Douglas Wright, Esquire, Tammy L. Mercer, Esquire, Young Conaway Stargatt & Taylor, LLP, Wilmington, DE, for Defendants Karen Radke and Thomas R. Tizzio.

Michael S. Kim, Esquire, Steven W. Perlstein, Esquire, Jonathon D. Cogan, Esquire, Robert W. Henoch, Esquire, Kobre & Kim, LLP, New York City, of counsel for Defendants Karen Radke and Thomas R. Tizzio.

Edward P. Welch, Esquire, Edward B. Micheletti, Esquire, Skadden, Arps, Slate, Meagher & Flom, LLP, Wilmington, DE, for Defendant Edward E. Matthews.

John L. Gardiner, Esquire, Lauren E. Aguiar, Esquire, Skadden, Arps, Slate, Meagher & Flom, LLP, New York City, of counsel for Defendant Edward E. Matthews.

Kurt M. Heyman, Esquire, Patricia L. Enerio, Esquire, Proctor Heyman, LLP, Wilmington, DE, for Defendant Howard I. Smith.

Vincent A. Sama, Esquire, Eric M. Robinson, Esquire, Jeffrey R. Burke, Esquire, Catherine B. Schumacher, Esquire, Winston & Strawn, LLP, New York City, of counsel for Defendant Howard I. Smith.

## OPINION

STRINE, Vice Chancellor.

### I. *Introduction*

The motion to dismiss now pending in this derivative suit brought on behalf of American International Group, Inc. raises the following question: may AIG sue its co-conspirators for the harm that AIG suffered as a result of two alleged, illegal conspiracies involving AIG and those third-party conspirators?

The two supposed conspiracies are separate. First, according to the First Amended Combined Complaint (the "Complaint"), AIG engaged in an illegal bid-rigging conspiracy to carve up the market for certain

insurance contracts (the "Bid–Rigging Conspiracy"). At least two other corporate families were also allegedly involved in this conspiracy: defendant and leading insurance broker Marsh & McLennan Companies, Inc. and several of its subsidiaries (collectively "Marsh & McLennan" or "Marsh"); and defendant insurer ACE, Limited and two of its subsidiaries (collectively "ACE").

The Complaint also pleads that AIG engaged in a separate illegal conspiracy with defendant General Re Corporation and its subsidiary General Reinsurance Corporation (collectively "Gen Re"). This conspiracy involved AIG writing fake reinsurance contracts for Gen Re so that AIG could inflate its loss reserves, thus making AIG appear to be a healthier company than it actually was and inflating AIG's stock price (the "Fake Reinsurance Conspiracy"). AIG allegedly paid Gen Re $5 million for going along with the Conspiracy.

In a previous decision, this court found that the plaintiffs had stated well-pled breach of fiduciary duty claims against certain high-ranking AIG officers who were allegedly involved in the conspiracies at issue in this motion, as well as other illegal activities.[1] In that decision, this court allowed AIG to sue its own directors, officers, and employees for the damage they caused to AIG by having the corporation engage in illegal acts. In so holding, this court did not have to confront the in pari delicto doctrine's bar on suing third-party co-conspirators. That is because the doctrine does not have force in a suit by a corporation against its own officers or employees. When a corporation sues insiders for their faithless behavior in causing the corporation to break the law, there is no logical reason why the corporation cannot recover. It is irrelevant whether that behavior, as is pled here, was inspired at least in substantial part by a desire to increase the corporation's profits or stock price. Rather, in a situation where faithless fiduciaries cause the corporation to break the law, the corporation should have the chance to recover against the officials who caused the corporation to put its charter at risk, suffer legal penalties, and incur other harms. To hold otherwise would be to let fiduciaries immunize themselves through their own wrongful, disloyal acts.

Therefore, this motion does not involve the plaintiffs' desire to ensure that those AIG insiders who caused AIG to engage in illegal conduct be held accountable to AIG. The plaintiffs have already secured the right to do that and to get a summing up of accounts within the AIG corporate governance structure.

Rather, this motion presents a related, but distinct, question: to what extent may a corporation like AIG recover from its co-conspirators for the damage the corporation suffered due to its own illegal conduct? Here, the derivative plaintiffs seek to recover on behalf of AIG from Marsh & McLennan, ACE, and Gen Re on the theory that those corporations conspired with AIG to commit illegal acts and, in the case of Marsh, aided and abetted breaches of fiduciary duty by AIG insiders. And, the plaintiffs did not confine themselves to suing just Marsh & McLennan, ACE, and Gen Re themselves. Rather, in their Complaint, the plaintiffs named as defendants twenty-two individuals who were employed by AIG's corporate co-conspirators and who the plaintiffs believed were instrumental in the Bid–Rigging and Fake Reinsurance Conspiracies. Although in this court's earlier opinion in this case it rejected the plaintiffs' basis for personal jurisdiction over most of those defendants,[2] the

1. See In re Am. Int'l Group, Inc., 965 A.2d 763, 799 (Del.Ch.2009) ("AIG I").

2. AIG I, 965 A.2d at 815–16.

plaintiffs sought to hold all of those individual participants liable to AIG. Even now, the plaintiffs are pressing a claim in this action against Susan Rivera, who was the CEO of an ACE subsidiary when that subsidiary allegedly participated in the Bid–Rigging Conspiracy, and insist that they will seek to sue the dismissed individuals in a court with personal jurisdiction over them.[3]

Accordingly, what is at stake here is whether AIG may seek an accounting for the damages it suffered as a result of its engagement in two illegal conspiracies from AIG's principal third-party co-conspirators and an officer of one of those co-conspirators. In this opinion, I conclude that the answer to this question is no.

Questions of this sort have long been addressed by the venerable in pari delicto doctrine, one of the primary purposes of which is to prevent courts from having to engage in inefficient and socially unproductive accountings between wrongdoers. That purpose is directly implicated here. The plaintiffs in this case are essentially demanding that this court assess the conspiracy among AIG, Marsh & McLennan, and ACE and shift responsibility so that each corporation gets no more or less than its just share of the unjust desserts of its illegal conduct. The same demand is made as to the alleged conspiracy between AIG and Gen Re.

With good reason, the in pari delicto doctrine bars this type of suit. In criminal conspiracies, like most joint ventures, some participants are likely to come out better than others. But, in this context there is no societal interest in making sure that each party gets its "fair" share of the conspirators' societally unfair bargain. Nor is there any reason to depart from this general rule in the corporate context and give corporations a greater ability to recover from misfortunes arising from their illicit activities than is afforded to individuals. For example, it is difficult to imagine how departing from the traditional rule that co-conspirators should be left where they stand and instead providing an accounting between corporate co-conspirators would create a more wholesome incentive for corporations to obey the law. Rather, it would seem to dampen the incentive for law compliance by preserving the hope that the costs of an exposed conspiracy might be shifted to the corporation's partners in crime. Such a departure would also require that this court engage in an extremely complex economic and fault-finding inquiry involving speculation about the extent to which each participant was a net winner or loser as a result of its illegal conduct. That complexity and imprecision would obviously be compounded to the extent that plaintiffs, such as those here, do not limit themselves to suing their corporation's corporate co-conspirators, but also bring claims against the corporate co-conspirators' own insiders.

Instead, the better answer is the traditional one: where, as here, a corporation like AIG is alleged to have engaged in concerted illegal activity with third parties for that corporation's own benefit, that corporation may not recover against its third-party co-conspirators. This does not leave stockholders without a remedy. Within each corporate family, stockholders may use derivative suits to seek relief from their corporation's own faithless fiduciaries for the harm suffered by their own corporation. But, the boundaries for recovery matter; they make stockholders and managers realize that the corporation will not be able to shift the costs of its own illegal

---

**3.** Being unable to distinguish the basis for personal jurisdiction over twenty-one of the twenty-two individual Marsh, ACE, and Gen Re defendants, the plaintiffs voluntarily dismissed their claims against them without prejudice.

conduct to third parties. This encourages the adoption and implementation of effective law compliance and monitoring programs, and it protects the judiciary from having to ensure the "fair and equitable" distribution of the gains and losses of concerted illegal activity.

For these and other reasons, I dismiss the claims the derivative plaintiffs have brought against Marsh & McLennan, ACE, Gen Re, and Susan Rivera on grounds of in pari delicto.

## II. *Factual Background*[4]

The Complaint alleges that AIG officers and employees, led by AIG's then-CEO, Maurice "Hank" Greenberg, engaged in almost a dozen separate conspiracies that overstated AIG's financial position by billions of dollars and made AIG complicit in illegal bid-rigging schemes. Among those allegedly faithless fiduciaries were key AIG insiders including Edward Matthews, who served both as director and as Vice Chairman of Investments and Financial Services, and Thomas Tizzio, who was both a director and AIG's Senior Vice Chairman of General Insurance. Most of the schemes that these insiders allegedly engaged in were internal to AIG, but, in several instances, AIG's wayward insiders allegedly worked with genuine third parties.

In this action, the plaintiffs are suing derivatively to recover for the harm they claim AIG suffered as a result of its illegal activities. As part of this effort, they have not only brought claims against AIG insiders and PricewaterhouseCoopers LLP— AIG's auditor—but also against the third parties with whom AIG allegedly engaged in fraud.

### A. *Procedural History*

In an earlier opinion in this action, this court addressed the motions to dismiss brought by PricewaterhouseCoopers and several former-AIG officers and employers.[5]

In that previous decision, this court held that the Complaint survived dismissal as against challenge by insider defendants Hank Greenberg, Edward Matthews, and Thomas Tizzio and that the Complaint stated well-pled claims of breach of fiduciary duty against those defendants.[6] The Complaint also adequately alleged fraud and conspiracy claims against Tizzio.[7]

By contrast, this court held that New York law governed the claims against AIG's auditor, PricewaterhouseCoopers, and that New York law's approach to the doctrine of in pari delicto barred AIG from recovering against PricewaterhouseCoopers.[8] That holding was driven by the court's choice of law analysis and did not reflect whether AIG could have maintained such a suit under Delaware law.[9]

Finally, in that decision, this court held that it did not have personal jurisdiction over certain AIG officers and employees who had allegedly engaged in improper behavior before 10 *Del. C.* § 3114 was broadened to cover certain corporate officers. Because none of the acts relevant to the illegal conduct pled in the Complaint occurred in Delaware and none of those defendants was a Delaware resident, this

---

4. The facts that I outline are all drawn from the plaintiffs' Complaint. Because this is a motion to dismiss, I have taken all of these allegations as true and granted the plaintiffs the benefit of all reasonable inferences that flow from that Complaint.

5. *See generally AIG I,* 965 A.2d 763.

6. *Id.* at 799.

7. *Id.* at 807.

8. *Id.* at 827.

9. *Id.* at 827–28.

court could not exercise jurisdiction over them.[10]

I now address the motions to dismiss brought by the third parties who allegedly conspired with AIG to commit illegal acts. The relevant allegations in the Complaint center on two separate courses of illegal conduct: the Fake Reinsurance Conspiracy and the Bid–Rigging Conspiracy.

### B. Gen Re's Fake Reinsurance Purchase

The plaintiffs seek to hold Gen Re accountable to AIG for harm AIG suffered when it engaged in the Fake Reinsurance Conspiracy with Gen Re. In that transaction, AIG appeared to be selling Gen Re $500 million in reinsurance. But, in reality, no reinsurance actually took place. Instead, AIG paid Gen Re $5 million to engage in a fake transaction that allowed AIG to overstate its insurance reserves.

According to the Complaint, the Fake Reinsurance Conspiracy was an AIG-driven scheme cooked up after AIG's 2000 earnings release reporting a $59 million decrease in general insurance reserves, a reduction that drew sharp criticism from market analysts. By the end of the day that AIG released those earnings, the price of AIG's stock had fallen 6%. Concerned about this drop, AIG's Chairman and CEO, Hank Greenberg, allegedly called Gen Re's CEO to pitch a fake transaction that would provide AIG with the appearance of larger general insurance reserves.

The Complaint alleges that the resulting Fake Reinsurance Conspiracy was the product of months of careful planning by top-level insiders at AIG and Gen Re. As was allegedly agreed, Gen Re purchased $500 million worth of reinsurance from National Union Fire Insurance Company of Pittsburgh, Pennsylvania, an AIG subsidiary. AIG then paid out $500 million on the policy. The economic substance of the transaction did not involve any transfer of insurable risk, but rather a simple round-trip of money, with Gen Re getting paid $5 million for acting as AIG's counterparty to the transaction. The only purpose of the transaction was supposedly to create the appearance of a legitimate insurance contract and thereby enable AIG to report a (fake) $500 million increase in its insurance reserves and premiums. AIG and Gen Re then allegedly concealed Gen Re's payoff by engaging in a series of complicated transactions designed to leave Gen Re with a net gain of $5 million as compensation for its part in the Conspiracy.

The Complaint alleges that the motivation for the Fake Reinsurance Conspiracy was to bolster AIG's stock price. In particular, the Complaint suggests that Greenberg and other AIG insiders wanted to prop up AIG's stock price so that AIG could use its stock to acquire American General Corporation.

In time, the true nature of the Fake Reinsurance Conspiracy was uncovered. New York's Attorney General brought a complaint, and the Securities and Exchange Commission and the Department of Justice filed civil and criminal actions respectively. In the end, two high-level Gen Re employees pled guilty to charges, and five key AIG and Gen Re insiders were convicted of felonies.

AIG itself settled the claims against it as part of a larger settlement in which AIG paid out $825 million. AIG also had to restate balance sheet accounts by hundreds of millions of dollars.

Based on this conduct, the plaintiffs have brought claims for fraud, conspiracy, and aiding and abetting a breach of fiduciary duty against Gen Re.

---

**10.** *Id.* at 815–16.

## C. Bid–Rigging Allegations

The other set of allegations at issue in this motion revolve around the Bid–Rigging Conspiracy. At the center of this scheme was Marsh & McLennan, the world's largest provider of insurance brokerage and consulting services. The other participants were leading insurance companies, including AIG itself, which the Complaint describes as "the world's largest commercial insurance company with approximately 93,000 employees in 130 countries." [11] The other key participant for present purposes was ACE.

The Complaint provides well-pled allegations that AIG was a willing participant in this Conspiracy and that top level AIG executives, including Hank Greenberg, were aware of it.

As described in the Complaint, the Bid–Rigging Conspiracy worked by taking advantage of Marsh & McLennan's position as a leading broker in the market for insurance. On its surface, Marsh & McLennan's insurance brokerage business is simple: clients pay Marsh to find the best insurance coverage at the lowest price. But, according to the plaintiffs, Marsh & McLennan used this privileged position to manipulate ostensibly competitive markets in two separate schemes.

In the first scheme, insurance companies like AIG and ACE supposedly paid Marsh & McLennan millions in "contingent commissions," and in exchange those insurance companies became "preferred markets" or "partners" to whom Marsh steered business.[12] This allegedly involved Marsh & McLennan giving AIG and other participants inside information, including timing information and what type of coverage to provide.

In the second scheme, the Complaint states that Marsh & McLennan and its co-conspirators, AIG and ACE, engaged in sham auctions. Marsh would allegedly predetermine which insurance company would win a particular policy. If, for example, AIG was selected to win that policy, it could submit its proposed insurance price without having to worry about competition from ACE. In that circumstance, ACE would intentionally submit a plausible but out-of-the-running bid so that AIG would win. Likewise, when ACE was the selected winner, AIG would submit a similarly plausible losing bid to make it look like the auction had integrity. In this way, the insurance companies involved could charge rates free from market pressure while Marsh clients believed that their coverage rates had been determined by competitive auctions.

The Complaint alleges that AIG's CEO and other officers were aware of the Bid–Rigging Conspiracy, and caused AIG to participate in it so as to advantage AIG. Defendant Susan Rivera, the CEO of ACE, Limited subsidiary ACE USA, and the only individual defendant outside of AIG left in this action, as well as other ACE insiders, was also allegedly in the know.

Like the Fake Reinsurance Conspiracy, this scheme was eventually uncovered. AIG, Marsh, and ACE employees have since pled guilty to criminal charges. And, the various corporate conspirators all settled claims brought by the New York Attorney General and the New York State Insurance Department. Marsh & McLennan agreed to payout $850 million to policyholders, implement new business practices, and issue a public apology. AIG paid $375 million to settle the claims against it. And, ACE settled for $80 million in restitution and penalties.

---

**11.** First Amended Combined Complaint ("Compl.") ¶ 65.

**12.** Compl. ¶ 350.

In the Complaint, the plaintiffs seek to hold Marsh & McLennan, ACE, and Rivera accountable for the harm AIG suffered as a result of the Bid–Rigging Conspiracy, including the money that AIG paid in contingent commissions, the fines that AIG paid, and the customers that the plaintiffs speculate that AIG might have obtained had it competed in the auctions in which ACE was slated to win. To obtain this relief, the Complaint pleads counts of fraud and conspiracy against Marsh & McLennan, ACE, and Rivera, as well as counts of aiding and abetting a breach of fiduciary duty and unjust enrichment against Marsh.

### III. *Legal Analysis*

■■■ Gen Re, Marsh, ACE, and Rivera (collectively, the "Third–Party Defendants") have moved to dismiss the claims against them for failure to state a claim because, among other reasons, the Complaint pleads that AIG was a willing participant in the illegal conduct, and therefore the doctrine of in pari delicto bars AIG from suing its co-conspirators for any harm AIG suffered due to its own misconduct. In deciding this motion, I apply the familiar Rule 12(b)(6) standard.[13] This means that I must accept all well-pled allegations in the Complaint as true and grant the plaintiffs all reasonable inferences that flow from those allegations.[14] But, even at the motion to dismiss stage,

the plaintiffs are only entitled to inferences that are supported by pled facts, not conclusory allegations.[15]

Here, that caveat is important. In briefing and arguing this motion, the plaintiffs have sought to distance themselves from their own allegations. But, the Complaint's allegations regarding the following key points are clear and unambiguous:

- High-level officers at AIG were aware of and encouraged the Fake Reinsurance and Bid–Rigging Conspiracies;
- Those high-level officers sought to benefit AIG through the attainment of higher profits, a better balance sheet, and a higher stock price by causing AIG to engage in the Fake Reinsurance and Bid–Rigging Conspiracies;
- Those high-level officers were knowledgeable about the details of both the Fake Reinsurance and Bid–Rigging Conspiracies and likely knew that they involved illegal conduct;
- Nothing in the Complaint supports a fair inference that AIG, which the Complaint describes as an economic titan run by a ruthless, domineering, and tough CEO, was subjected to anything remotely approaching duress. Rather, the Complaint alleges that high-level officers at AIG were knowing and willing participants in both Conspiracies, and that Hank Green-

13. The Third–Party Defendants have argued that this motion is governed by the heightened pleading standard applicable under Rule 23.1. For reasons explained in this court's earlier *decision,* that argument *is without* merit. Because the AIG board had the opportunity to consider whether to move to dismiss this litigation or take charge of it but instead, through a duly empowered special litigation committee, opted to take no position, the appropriate metric by which to measure whether the Complaint survives is the Rule 12(b)(6) standard, not the Rule 23.1 standard. *AIG I,* 965 A.2d at 810 (noting that under prior case law a board's neutral position is to be viewed

as a "tacit approval for the continuation of the litigation." (quoting *Kaplan v. Peat, Marwick, Mitchell & Co.,* 540 A.2d 726, 731 (Del. 1988))).

14. *Malpiede v. Townson,* 780 A.2d 1075, 1082–83 (Del.2001).

15. *In re Gen. Motors (Hughes) S'holder Litig.,* 897 A.2d 162, 168 (Del.2006) (holding that even on a motion to dismiss, this court need not "accept every strained interpretation of the allegations proposed by the plaintiff." (quoting *Malpiede,* 780 A.2d at 1083)).

berg personally instigated the Fake Reinsurance Conspiracy.

Another preliminary consideration is important. The parties chose not to burden me with an analysis of what law applies in determining whether the doctrine of in pari delicto bars AIG from recovering against its co-conspirators, appearing content to assume that Delaware law applies.[16] Because the parties have failed to brief the issue, they tacitly concede that Delaware law is applicable, and I therefore focus on whether the in pari delicto doctrine, as applied in Delaware, bars AIG's claims.[17] In applying Delaware law, I look, as courts often do, to well-reasoned precedent from federal courts, courts of our sister states, and our Anglo–American jurisprudential tradition.

## A. The Basics Of The In Pari Delicto Doctrine

■ Delaware, like most American jurisdictions and our federal common law (where applicable), embraces to some extent the venerable in pari delicto doctrine.[18] Latin for "in equal fault," [19] in pari delicto is a general rule that courts "will not extend aid to either of the parties to a criminal act or listen to their complaints against each other but will leave them where their own act has placed them." [20] The underlying idea is that there is no societal interest in providing an accounting between wrongdoers.[21]

16. Marsh & McLennan Companies and General Re Corporation are both Delaware corporations, and both of ACE, Limited's defendant subsidiaries are Delaware corporations. And, as is often the case, each of the parent companies has its headquarters outside of Delaware, with Marsh being headquartered in New York, ACE in the Bahamas, and Gen Re in Connecticut.

17. *CIT Tech. Fin. Servs. v. Owen Printing Dover, Inc.*, 2008 WL 2586683, at *4 (Del.Super.Apr. 30, 2008) (holding that choice of law issues were waived because they were not raised before closing argument); *see also Neely v. Club Med Mgmt. Servs., Inc.*, 63 F.3d 166, 180 (3d Cir.1995) (observing that "choice of law issues may be waived" and citing cases for that proposition); *Bagdon v. Bridgestone/Firestone, Inc.*, 916 F.2d 379, 383 (7th Cir.1990) ("Bagdon has waived any claim to the benefit of Ohio law by not briefing the choice-of-law question issue in either the district court or this court.").

18. *Burns v. Ferro*, 1991 WL 53834, at *2 (Del.Super.Mar. 28, 1991) ("Where parties to a contract are in pari delicto, a court will 'leave them where it finds them,' and will refuse to enforce the contract. A plaintiff who participates in a fraudulent scheme may not sue and recover for injuries that arise out of the same transaction." (quoting *Morford v. Bellanca Aircraft Corp.*, 67 A.2d 542, 547 (Del.Super.1949), other citations omitted)).

19. BLACK'S LAW DICTIONARY 806 (8th ed. 1999). The phrase in pari delicto in turn comes from

the expression *in pari delicto potior est conditio defendentis*, which means "[w]here both parties are equally in the wrong, the position of the defendant is the stronger." BLACK'S LAW DICTIONARY 1725 (8th ed. 1999).

20. 1 AM.JUR.2D ACTIONS § 40.

21. 3 JOHN NORTON POMEROY, EQUITY JURISPRUDENCE § 940 n. 5 (5th ed. 1941) (hereinafter "POMEROY") ("It should be observed that the defense of illegality is allowed from motives of public policy, rather than from a regard for the interests of the objecting party.... The objection comes in appearance from the individual litigant, but in reality from society—the state—speaking through the courts."); *see also Lewis v. Davis*, 145 Tex. 468, 199 S.W.2d 146, 151 (1947) ("[In pari delicto] is adopted, not for the benefit of either party and not to punish either of them, but for the benefit of the public."). The underlying policy has been described as either the general principle that courts should not aid parties that engaged in illegal conduct or the more specific, but related, idea that by closing their doors to a plaintiff that is in pari delicto, courts are deterring illegal conduct. *See Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 306, 105 S.Ct. 2622, 86 L.Ed.2d 215 (1985) (noting that in pari delicto is based on the principles that "courts should not lend their good offices to mediating disputes between wrongdoers" and "denying judicial relief to an admitted wrongdoer is an effective means of deterring illegality"); *Bein v. Heath*, 47 U.S. 228, 247, 6

As that general rule has been recently been stated by this court: "under the in pari delicto doctrine, a party is barred from recovering damages if his losses are substantially caused by activities the law forbade him to engage in." [22] The general rule of in pari delicto, however, does not apply in certain discrete circumstances. For example, if a plaintiff engaged in illegal acts because of duress or where an illegal contract is "intrinsically unequal," the parties are not considered to be in truly equal fault and in pari delicto will not bar the plaintiff's action.[23] More generally, even if the parties do bear equal fault, in pari delicto will not bar an action where the suit involves sufficiently important countervailing interests of public policy.[24]

In applying the doctrine, there is no doubt that under the general rule, AIG is barred from recovering against the Third–Party Defendants. The harm that the plaintiffs seek to recover on AIG's behalf unquestionably resulted from AIG's own participation in illegal conduct. The Complaint pleads that AIG suffered hundreds of millions of dollars in fines, as well as additional millions of dollars in litigation and investigation costs along with decreased market confidence and therefore a decreased stock price as a result of AIG's knowing complicity in the Fake Reinsurance and Bid–Rigging Conspiracies.[25]

There is also no question that the Complaint pleads facts demonstrating that AIG bears "substantially equal responsibility" for the illegal schemes with its co-conspirators. Although the literal translation of in pari delicto is "in equal fault," the doctrine does not require that a court engage in the type of accounting that in

How. 228, 12 L.Ed. 416 (1848) ("The equitable powers of this court can never be exerted in behalf of one who has acted fraudulently, or who by deceit or any unfair means has gained an advantage. To aid a party in such a case would make this court the abetter of iniquity."); *Ross v. Bolton*, 904 F.2d 819, 824 (2d Cir.1990) ("[In pari delicto] is predicated on the principle that to grant plaintiff relief would contravene the public good by aiding one to profit from his own wrong."); 1 JOSEPH STORY, COMMENTARIES ON EQUITY JURISPRUDENCE ¶ 298 (13th ed. 1886) (grounding in pari delicto in the idea that leaving parties to an illegal actions without remedy will discourage illegal activity).

22. *In re LJM2 Co–Investment, L.P.*, 866 A.2d 762, 775 (Del.Ch.2004) (quoting *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 354 (3d Cir.2001)) (emphasis omitted).

23. 3 POMEROY § 942; *see also* 1 JOSEPH STORY, COMMENTARIES ON EQUITY JURISPRUDENCE ¶ 300 (providing a similar list of circumstances in which plaintiff has essentially been forced into illegal conduct and thus does not bear equal fault).

24. *See S. Phil. Dressed Beef Co. v. Sugarman*, 139 A. 80, 81 (Del.Super.1927) (holding that in pari delicto "has always been regarded by courts of equity as without controlling force in all cases in which public policy is considered as advanced by allowing either party to sue for relief against the transaction"); *Pinter v. Dahl*, 486 U.S. 622, 633, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988) (noting that in pari delicto requires that "public policy implications be carefully considered before the defense is allowed"); 3 POMEROY § 941 ("Whenever public policy is considered as advanced by allowing either party to sue for relief against the transaction, then relief is given to him.").

25. Under basic agency principles, AIG is charged with the knowledge of its agents. *Teachers' Ret. Sys. of La. v. Aidinoff*, 900 A.2d 654, 671 n. 23 (Del.Ch.2006) ("[I]t is the general rule that knowledge of an officer or director of a corporation will be imputed to the corporation."); *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *11 (Del.Ch. Aug. 26, 2005) ("Delaware law states the knowledge of an agent acquired while acting within the scope of his or her authority is imputed to the principal."); 3 AM.JUR.2D AGENCY § 273 (principals are generally bound by the knowledge of their agents).

pari delicto is meant to avoid before invoking the protection that the doctrine affords the court and the public.[26] In other words, the concept of equal fault is not one designed to precisely calibrate which of the parties acted with the guiltiest mind; rather, it simply requires the court to determine that each party acted with scienter in the sense that it was a knowing and substantial participant in the wrongful scheme.[27] To go further and distinguish, for example, among willing foot soldiers, consiglieres, and the ultimate crime boss is to engage in precisely the type of summing up among co-conspirators that the doctrine of in pari delicto is intended to obviate.

Despite their own allegations regarding AIG's own knowing complicity in illegal activity, the derivative plaintiffs seek to exploit the squishy manner in which some courts have employed the in pari delicto doctrine and to avoid dismissal by having this court find that this case falls within some "exception" to the traditional application of the doctrine. To that end, the plaintiffs have advanced several hard to distinguish arguments contending that AIG should be able to recover for the ill-effects of its own illegal acts. At their core, these arguments all revolve around the idea that the law should let AIG engage in an accounting among wrongdoers because that would help AIG's innocent public stockholders, regardless of the consequences to other policy interests. In supporting that idea, the plaintiffs have offered four basic arguments as to why in pari delicto does not bar their claims here: (1) with regard to the Bid–Rigging Conspiracy, AIG, despite its size and sophisti-

cation, might have been forced into illegal conduct by Marsh & McLennan; (2) despite the unambiguous allegations to the contrary in the plaintiffs' Complaint, it is possible that only mid-level managers at AIG knew of the wrongdoing at issue; (3) some of the fiduciaries at AIG who engaged in illegal conduct might have stood to gain personally from their illegal conduct in addition to the gains AIG hoped to make; and (4) AIG's board of directors and stockholders did not approve the illegal transactions.

Properly conceptualized, these are really two separate lines of argument. The first two arguments are essentially contentions that, despite the clear import of the plaintiffs' Complaint, it may be that AIG is somehow not as guilty of illegal behavior as its co-conspirators and thus is not barred by in pari delicto. Second, and more grounded in the plaintiffs' general policy contention, the other two arguments assert that, even if AIG is responsible for its illegal actions, this should not stop so-called innocent stockholders from suing derivatively because it would be unjust to limit corporate recovery when the corporate harm was caused by the illegal acts of faithless fiduciaries.

I now deal with those arguments in turn.

### B. AIG Is Equally At Fault For Purposes Of The In Pari Delicto Doctrine

The plaintiffs' first set of arguments essentially seeks to excuse AIG's conduct relative to AIG's co-conspirators, arguing that AIG is not equally at fault for the

---

**26.** *See* 1 Am.Jur.2d Actions § 40 (in pari delicto applies "even though the plaintiff was led into a path of crime by one more culpable").

**27.** *See Bateman*, 472 U.S. at 307, 105 S.Ct. 2622 (noting that even in its classic and stricter formulation, in pari delicto applies where a plaintiff bears "substantially equal responsi-

bility for his injury"); *Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 153, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968) ("Plaintiffs who are truly in pari delicto are those who have themselves violated the law in cooperation with the defendant." (Harlan, J., concurring in part and dissenting in part)).

illegal actions at issue. To reach this conclusion, the plaintiffs argue that, despite its size and sophistication, AIG might have been pressed into the Bid–Rigging Conspiracy by a stronger Marsh & McLennan, or that it might be the case that the highest level of AIG officers did not know of the various illegal conspiracies. I use the word "might" loosely in both instances because the plaintiffs have not pled that either of these situations is true. In fact, the only reasonable interpretation of the plaintiffs' Complaint is that exactly the opposite is true—that AIG was a large and sophisticated actor that could have refused to go along with the Bid–Rigging Conspiracy and that the highest ranking AIG officers were aware of, and in the case of the Fake Reinsurance Conspiracy instigated, AIG's illegal activities. The reason that is the only reasonable interpretation is simple: it is the theory repeatedly and unvaryingly pled in the Complaint itself.

1. *The Complaint Does Not Support A Reasonable Inference That AIG Was Forced To Engage In The Bid–Rigging Conspiracy*

The plaintiffs' first excuse for AIG's actions is that Marsh & McLennan conceived of the Bid–Rigging Conspiracy and that AIG had to go along.[28] Admittedly, there is precedent for finding that a conspirator does not bear substantially equal responsibility when that conspirator has been forced into participation in the conspiracy.[29] And, at oral argument, the plaintiffs argued that, as to the Bid–Rigging Conspiracy, AIG could be deemed to somehow fall into that category because of Marsh & McLennan's market power.[30] But, at its core, this argument is really one of duress: that AIG's knowing involvement in the Conspiracy should be excused because it had no other choice. And, the facts pled in the Complaint entirely belie any application of the doctrine of duress.

 Given that the doctrine of duress is usually asserted when a person knowingly violates a legal duty, courts rightly employ duress sparingly.[31] To excuse AIG's knowing complicity in the Bid–Rigging Conspiracy because of duress, the plaintiffs would have to prove that AIG was "deprived of the free exercise of [its] will through wrongful threats or acts directly against [AIG's] business interest."[32] This would mean showing: (1) a wrongful act; (2) that the act overcame AIG's "will"; and (3) that AIG had no legal remedy for protecting its interests.[33]

Even when viewed in the plaintiff-friendly light required under Rule 12(b)(6), the Complaint does not come within two or three solar systems of sup-

28. This argument only sensibly applies to the Bid–Rigging Conspiracy. The plaintiffs have not argued that Gen Re forced AIG to go along with the Fake Reinsurance Transaction. Quite the contrary, that entire scheme was supposedly instigated at AIG's and Hank Greenberg's behest. Compl. ¶ 196–97.

29. *See, e.g., Perma Life,* 392 U.S. at 139, 88 S.Ct. 1981; *see also* 3 POMEROY § 942 (noting that where there is "imposition, oppression, duress, threats, undue influence, taking advantage of necessities or of weakness, and the like" the parties are *not equally at fault* under in pari delicto).

30. 4/20/2009 Tr. at 33.

31. *See* 25 AM.JUR.2D DURESS AND UNDUE INFLUENCE § 20 (noting that the doctrine of economic duress is "limited because ordinary hard bargaining is acceptable ... and should not be discouraged by courts" and that economic duress only applies to "special, unusual, or extraordinary situations in which unjustified coercion is used to induce a contract").

32. *R.M. Williams Co. v. Frabizzio,* 1990 WL 18399, at *3 n. 3 (Del.Ch. Feb. 22, 1990) (internal quotation omitted).

33. *E.I. DuPont de Nemours & Co. v. Custom Blending Int'l Inc.,* 1998 WL 842289, at *4 (Del.Ch. Nov. 24, 1998).

porting a rational inference that these requirements were met. That is not surprising. As the Complaint fairly alleges, AIG was a very profitable industry behemoth with 93,000 employees across 130 nations. The Complaint also alleges that AIG was led by a legendarily aggressive and successful CEO, who was used to rolling over business adversaries, rather than rolling over for them.[34] In fact, according to the Complaint, Marsh was worried about maintaining AIG's good will. The plaintiffs describe an instance in which ACE broke ranks on an auction that was allegedly supposed to be rigged. When one of Marsh's officers learned of this, she allegedly became upset because not giving AIG the business might "jeopardize Marsh's relationship with AIG." [35] And, although not conclusive on this issue, it is worth noting that at the time of the Bid–Rigging Conspiracy, Marsh and ACE were run by Jeffrey and Evan Greenberg respectively, Hank's sons, who one must infer would have been unlikely to spite their powerful father for refusing to participate in an illegal enterprise.

■■■■■■ More importantly, even if the Bid–Rigging Conspiracy was suggested by Marsh & McLennan, and even if Marsh had some market power as a broker, AIG clearly had a legal remedy for protecting its interests. Duress does not exist where a party simply chooses to participate in illegal activity because doing so is the better business decision. "A threat, even if improper, does not amount to duress if the victim has a reasonable alternative to succumbing and fails to take advantage of it." [36] Here, all AIG had to do was to go to the relevant insurance regulatory and law enforcement agencies, who, there can be little doubt, would have squelched Marsh & McLennan's illegal idea. Indeed, a mere threat to disclose such an idea might have been sufficient to make Marsh play by the rules. But, AIG did not choose this course of action. Rather, the Complaint alleges that AIG, with the knowledge of Hank Greenberg, was a happy participant in the Bid–Rigging Conspiracy because that Conspiracy gave AIG a guaranteed flow of lucrative insurance business.

2. *The Possibility That Only Mid–Level AIG Managers Were Involved In the Illegal Conduct Does Not Preserve The Plaintiffs' Claims From Dismissal*

The plaintiffs' argument that dismissal is inappropriate because it might turn out that AIG participated in the Fake Reinsurance and the Bid–Rigging Conspiracies through managers beneath the top ranks of the company also has no force. Here, the plaintiffs argue that dismissal is not appropriate because at trial it may turn out that only mid-level AIG managers were involved in the illegal acts at issue, and therefore AIG should be able to recover from its corporate co-conspirators who might have participated through higher-level wrongdoers. But, like the plaintiffs' duress argument, this assertion is not supported by any of the pled facts. And, even if it were so supported, this would be a distinction without a difference. There would still be no non-frivolous argument that AIG itself does not bear liability to innocent third parties for harm caused by the illegal schemes, and therefore I see no reason to give AIG the right to recover from co-conspirators.[37] Having invested its employees with the authority necessary to engage in the illegal actions at issue,

34. *See, e.g.* Compl. ¶ 583–85 (describing how Greenberg ran AIG with an "iron fist" and so dominated the company that even AIG's directors were unwilling to challenge his authority).

35. Compl. ¶ 396.

36. *Cianci v. JEM Enter., Inc.,* 2000 WL 1234647, at *11 (Del.Ch. Aug.22, 2000) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 175 cmt. b (1981)).

37. *Draper v. Olivere Paving & Const. Co.,* 181 A.2d 565, 568–69 (Del.1962) (holding that a

AIG is responsible for those employees' (mis)use of that power.

As a preliminary matter, and as has already been discussed, the plaintiffs plainly and unambiguously allege that the highest levels of AIG managers were involved in the two Conspiracies.[38]

■ But, even if, contrary to the Complaint's own assertions, the Bid–Rigging Conspiracy did not involve the very senior-most AIG executives but only well-compensated managers with the authority to make critical insurance bidding decisions, the acts of those managers will still be imputed to AIG. That AIG's top-level management did not ratify the Bid–Rigging Conspiracy would not be a defense in a suit from a state insurance commissioner or an insurance client who had relied on

the integrity of the auction process.[39] When a corporation empowers managers with the discretion to handle certain matters and to deal with third parties, the corporation is charged with the knowledge of those managers when the corporation is sued by innocent parties.[40]

Thus, the possibility that the Complaint's allegations might be wrong and it might turn out that neither Hank Greenberg nor any of AIG's other high-level officers knew about the Bid–Rigging Conspiracy does nothing to diminish the applicability of the in pari delicto doctrine to bar the plaintiffs' claims because AIG would still be responsible for the conduct of the mid-level managers who did engage in the illegal conduct at issue. Likewise, if somehow the Fake Reinsurance Conspira-

---

master is liable for the torts of her servant); *see also Aidinoff,* 900 A.2d at 671 n. 23 (noting that "it is the general rule that knowledge of an officer or director of a corporation will be imputed to the corporation").

**38.** Compl. ¶¶ 197 (alleging that Greenberg proposed the Fake Reinsurance Conspiracy); 259 ("AIG and Gen Re—and all relevant AIG and Gen Re Personnel involved in [the Fake Reinsurance Conspiracy]—knew and understood that these agreements were mere shams...."); 358 ("That Maurice Greenberg and the AIG Officer Defendants knew about the contingent commission payments to [Marsh & McLennan] is beyond peradventure."); 361 (alleging that "Maurice Greenberg and the AIG Officer Defendants" entered into the scheme to rig insurance markets).

**39.** *See Am. Soc. of Mech. Engineers, Inc. v. Hydrolevel Corp.,* 456 U.S. 556, 570–71, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982) (holding that under federal antitrust law an employer is charged with wrongful acts of its agent, even an agent that was only acting with apparent authority). These same principles even apply to holding a corporation criminally liable. *See U.S. v. Basic Const. Co.,* 711 F.2d 570, 573 (4th Cir.1983) ("[A] corporation may be held criminally responsible for antitrust violations committed by its employees if they were acting within the scope of

their authority, or apparent authority, and for the benefit of the corporation, even if ... such acts were against corporate policy or express instructions."); *U.S. v. Koppers Co.,* 652 F.2d 290, 298 (2d Cir.1981) (holding that imputation in antitrust cases is governed by the scope of the employee's duties).

**40.** *Albert,* 2005 WL 2130607, at *11 ("Delaware law states the knowledge of an agent acquired while acting within the scope of his or her authority is imputed to the principal."); 3 WILLIAM MEADE FLETCHER, CYCLOPEDIA OF THE LAW OF CORPORATIONS § 790 ("[T]he general rule is well established that a corporation is charged with constructive knowledge ... of all material facts of which its officer or agent receives notice or acquires knowledge while acting in the course of employment within the scope of his or her authority, even though the officer or agent does not in fact communicate the knowledge to the corporation."); 18B AM. JUR.2D CORPORATIONS § 1444 ("Whether employees can be considered managerial employees so as to impute their actions to the corporation does not necessarily hinge on their level in the corporate hierarchy but depends on the degree of discretion the employee has in making decisions that will ultimately determine corporate policy."); RESTATEMENT (THIRD) OF AGENCY § 5.03 cmt. b (2006) (principals are generally bound by the knowledge of their agents).

cy was engineered by AIG managers lower in the food chain than Greenberg and his inner circle of trusted lieutenants, AIG would still bear responsibility for the knowledge of the managers who were able to enter a bogus $500 million transaction, use that transaction as the basis for AIG to file misleading financial statements, and give the investing public a false sense of the company's financial health.[41] There is nothing novel about the application of agency principles like this, as these are the same principles that skilled plaintiffs' advocates use all the time in securities cases.[42] Because the Complaint plainly pleads that the Fake Reinsurance and Bid–Rigging Conspiracies involved knowing participation in illegal misconduct by AIG officials charged with carrying out the relevant activities for AIG, AIG is "in pari delicto" with its co-conspirators and is barred from bringing claims against third parties unless some other exception to in pari delicto applies.

## C. There Is No Public Policy Justification For Relaxing The In Pari Delicto Doctrine To Allow A Conspiring Corporation To Sue Its Corporate Conspirators Or The Agents Of Those Conspirators

■ "Unless" is an important word in the in pari delicto context because the doctrine is subject to exception when another public policy is perceived to trump the policy basis for the doctrine itself.[43] For example, in the context of federal antitrust laws, the Supreme Court has held that the importance of vigorous enforcement of governmental antitrust policies justifies allowing a co-conspirator in a price-fixing conspiracy to sue its co-conspirators even when the ordinary application of in pari delicto would preclude the suit.[44] For similar reasons, in *Schleiff v. Baltimore and Ohio Railroad Company*,[45] this court did not apply its normal in pari delicto analysis to a derivative claim seek-

**41.** *See Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1254 (11th Cir.2008) ("Corporations, of course, have no state of mind of their own. Instead, the scienter of their agents must be imputed to them."); *Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F.Supp.2d 452, 481 (S.D.N.Y.2006) (noting in the context of a securities action that "[w]hile there is no simple formula for how senior an employee must be in order to serve as a proxy for corporate scienter, courts have readily attributed the scienter of management-level employees to corporate defendants").

**42.** *See, e.g., In re JP Morgan Chase Sec. Litig.*, 363 F.Supp.2d 595, 627 (S.D.N.Y.2005) (imputing the knowledge of a Vice Chairman, a Vice President, and a Managing Director); *In re BISYS Sec. Litig.*, 397 F.Supp.2d 430, 443 (S.D.N.Y.2005) (considering the knowledge of the corporation's regional vice president and its vice president of corporate finance). Some federal courts have even allowed plaintiffs to prevail in a securities fraud case by showing the collective knowledge of the corporation as opposed to the knowledge of individual high level fiduciaries. *In re WorldCom, Inc. Sec. Litig.*, 352 F.Supp.2d 472, 497

(S.D.N.Y.2005) ("To carry their burden of showing that a corporate defendant acted with scienter, plaintiffs in securities fraud cases need not prove that any one individual employee of a corporate defendant also acted with scienter. Proof of a corporation's collective knowledge and intent is sufficient.").

**43.** *See Pinter*, 486 U.S. at 633, 108 S.Ct. 2063 (noting that the in pari delicto doctrines requires that "public policy implications be carefully considered before the defense is allowed"); *Sugarman*, 139 A. at 81 (holding that the in pari delicto doctrine "has always been regarded by courts of equity as without controlling force in all cases in which public policy is considered as advanced by allowing either party to sue for relief against the transaction"); 3 POMEROY § 941 ("Whenever public policy is considered as advanced by allowing either party to sue for relief against the transaction, then relief is given to him.").

**44.** *Perma Life*, 392 U.S. at 139, 88 S.Ct. 1981 (allowing co-conspirators to sue because of the "public policy in favor of competition").

**45.** 130 A.2d 321 (Del.Ch.1955).

ing to rescind an allegedly improper rebate on freight charges because "to do so would be to override the public policy reflected in the Interstate Commerce Act." [46]

It is in this context that the plaintiffs have asked this court to craft an exception so that AIG can recover from its co-conspirators. Specifically, the plaintiffs argue that stockholders should be able to seek recovery on behalf of their corporation when faithless fiduciaries had some personal interest, or when there was a group of innocent insiders who might have been able to thwart the illegal activity. According to the plaintiffs, in such situations the traditional rule is unjust because the stockholders themselves did not act wrongfully, and therefore the traditional in pari delicto rules should be set aside so that the corporation can be made whole and thus the economic interests of the innocent stockholders can be protected.

But, the exceptions that the plaintiffs request would eviscerate the in pari delicto doctrine and contravene the policy judgments upon which that doctrine rests. Although one can sympathize with stockholders who lost money due to investments in a company that engaged in illegal activity, public policy is not served by allowing corporations to sue their own co-conspirators. Stockholders like the plaintiffs already have the benefit of one very large exception to the doctrine: the ability to sue corporate insiders on behalf of the company. The issue is therefore not whether stockholders can seek relief on the corporation's behalf, but from whom stockholders can seek that relief. And, contrary to the plaintiffs' assertions, allowing stockholders to expand this exception and sue outside of the borders of their corporation would not be socially useful. Rather, it would force courts to engage in inefficient accounting inquiries between wrongdoers while diminishing corporate boards' incentives to supervise their own agents.

1. *In A Derivative Action Recovery May Be Had From The Faithless Fiduciaries That Led The Corporation To Engage In Illegal Conduct*

 Understanding why public policy would not be advanced by crafting the type of broad exception that the plaintiffs seek starts with the fact that the plaintiffs already have the benefit of one exception to the doctrine: it is generally accepted that a derivative suit may be asserted by an innocent stockholder on behalf of a corporation against corporate fiduciaries who knowingly caused the corporation to commit illegal acts and, as a result, caused the corporation to suffer harm.[47]

To my mind, the recognition that this sort of suit should be permitted rests on sound principles grounded in the notion that a corporation must act through its human agents, and that if those agents act in an ultra vires capacity and injure the corporation, those agents should bear responsibility to the entity.[48] In this type of

---

**46.** *Id.* at 328.

**47.** *In re HealthSouth Corp. S'holders Litig.*, 845 A.2d 1096, 1107 (Del.Ch.2003) ("It is because corporations must act through living fiduciaries such as Scrushy that the application of the in pari delicto doctrine has been rejected in situations when corporate fiduciaries seek to avoid responsibility for their own conduct vis-a-vis their corporations."); *see also In re Walnut Leasing Co.*, 1999 WL 729267, at *5 (E.D.Pa. Sept. 8, 1999) ("Vis-a-

vis their corporations, insiders cannot avoid the consequences of their own handiwork."); *In re Granite Partners, L.P.*, 194 B.R. 318, 332 (Bankr.S.D.N.Y.1996) ("In pari delicto bars claims against third parties, but does not apply to corporate insiders or partners.").

**48.** *Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 2006 WL 4782378, at *33 n. 132 (Del. Ch. Aug. 10, 2006) (declining to apply in pari delicto to fraud claims against insiders because of the societal interest in holding culpa-

suit, there is also no suit by a co-conspirator, on the one hand, and its partner in crime on the other. That is because corporate agents (be they directors, officers, employees or outside contractors) do not conspire with the corporation when they work together to cause the corporation to act. Rather, the agents' actions are the actions of the corporation itself, and if those actions involve concerted illegal activity with another corporation, it is the two corporations who are, at core, the co-conspirators.

For this reason, putting the in pari delicto doctrine aside makes sense in a derivative suit where the objective is to give innocent stockholders and other corporate constituents a way to make themselves whole for a misuse of corporate power by the fiduciaries that the stockholders entrusted with that power. If there was illegal conduct, derivative plaintiffs may recover for the harm that the corporation suffered when those fiduciaries knowingly caused the corporation to violate positive law.[49]

Properly framed, the question therefore is not whether stockholders of a corporation like AIG can recover when the corporation's faithless fiduciaries engaged in illegal conduct; the question is whether the corporation can also recover from parties who were not its fiduciaries or agents.

2. *Public Policy Is Best Served By Limiting The Exception To The In Pari Delicto Doctrine To Suits By Corporations Against Their Own Insiders And Agents*

To answer that question in way that allows their claims to survive this motion, the plaintiffs now seek to expand the major exception for derivative suits against insiders with two additional exceptions, each of which would give corporations immunity from in pari delicto so that stockholders can sue third parties even when the corporations themselves engaged in illegal activity. But, neither of the proposed exceptions provides a principled basis for giving corporations these broad based rights.

The plaintiffs' first proposed exception would apply whenever the allegedly faithless fiduciaries had any conflict of interest. Specifically, the plaintiffs claim that AIG's officers did not only act to benefit AIG; rather, by engaging in their illegal activi-

ble insiders liable for their actions); *see also In re Walt Disney Co. Deriv. Litig.,* 906 A.2d 27, 67 (Del.2006) ("A failure to act in good faith may be shown, for instance ... where the fiduciary acts with the intent to violate applicable positive law...."); *Guttman v. Huang,* 823 A.2d 492, 506 n. 34 (Del.Ch.2003) ("[O]ne cannot act loyally as a corporate director by causing the corporation to violate the positive laws it is obliged to obey.").

**49.** As indicated in the prior dismissal decision in this case, the policy basis for allowing such derivative suits can easily be seen as justifying claims against corporate agents like outside auditors and counsel for the corporation's compliance committee. *AIG I,* 965 A.2d at 828 n. 246. Such agents are employed by a corporation's outside directors to help them ensure the lawful operation of the corporation. If these professionals fail in their duties

as gatekeepers, there is a strong argument to be made that they ought to be accountable for their malpractice and not be immunized by the very actions that were not discovered due to their failure to meet expected professional standards. *See NCP Litig. Trust v. KPMG LLP,* 187 N.J. 353, 901 A.2d 871, 888 (2006) ("Accordingly, we conclude that tort principles do not require that the imputation defense bars shareholder suits against allegedly negligent auditors. To the contrary, those principles ... require that such suits be permitted and that negligent auditors be held responsible for their wrongdoing."). But, of course, this is a matter upon which reasonable minds can differ, and New York law precludes such claims against an auditor for failing to detect serious financial wrongdoing by high-level corporate insiders. *AIG I,* 965 A.2d at 827–30.

ties those fiduciaries allegedly also hoped to enjoy some of the benefits of the illegal activity at issue through increased stock prices and promotions. But, such a broad exception would swallow the general rule of in pari delicto. Fiduciaries often promote their personal interests when they take action for the benefit of the corporation and its stockholders. Indeed, a major goal of corporate law is arguably to help the interests of corporate fiduciaries and the stockholders coincide. Accordingly, there is no principled reason for relieving a corporation of the consequences of acts taken on its behalf just because the fiduciaries in question hoped to also benefit themselves, if their acts were also intended to benefit the corporation.

To properly understand the plaintiffs' argument, it is necessary to review the state of the law as it exists. Many courts have recognized the so-called "adverse interest exception," which permits a corporation to sue its co-conspirators when the corporate agent responsible for the wrong-doing was acting solely to advance his own personal financial interest, rather than that of the corporation itself.[50] In that unusual context, it can be said that the corporation, although responsible to innocent third parties and the polity for any offense to them, is more conspired against than a conspirator.[51] To the extent that third parties conspire with the faithless insider in a plan to impoverish the corporation for the benefit of the insider and the other conspirators, courts have held that the doctrine of in pari delicto gives way in order to allow recovery from anyone who helped steal from the corporation.[52] For example, where a fiduciary acts with third parties in order to siphon off corporate funds, that fiduciary is not just working for her own benefit, she is acting to harm the corporation. Thus, the corporation should be able to sue the third party that helped the fiduciary harm the corporation. But, as explained in the prior dismissal decision in this case, the plaintiffs have not alleged the type of total abandonment of the corporation's interests traditionally needed to invoke the adverse interest exception.[53]

**50.** *See, e.g., In re Mediators, Inc.,* 105 F.3d 822, 827 (2d Cir.1997) (noting that there is an adverse interest exception but that it only applies "when the agent has 'totally abandoned' the principal's interests.") (quoting *Center v. Hampton Affiliates, Inc.* 66 N.Y.2d 782, 497 N.Y.S.2d 898, 488 N.E.2d 828, 830 (1985)); *Lafferty,* 267 F.3d at 359 ("[F]raudulent conduct will not be imputed if the officer's interests were adverse to the corporation and not for the benefit of the corporation." (quotations omitted)); RESTATEMENT (THIRD) OF AGENCY § 5.04 (noting that knowledge is generally not imputed "if the agent acts adversely to the principal in a transaction or matter, intending to act solely for the agent's own purposes or those of another person"). In these cases, the adverse interest exception is treated as simply reversing the general rule of imputation. That is, where applicable, the adverse interest exception will stop the knowledge of the corporation's agents from being imputed to the corporation. Accordingly, when applied in this manner, the adverse interest exception means that the corporation did not know of the illegal conduct and was not at equal fault. But, regardless of whether the adverse interest exception is seen as an exception to in pari delicto or to imputation, the effect is the same.

**51.** *See Cenco Inc. v. Seidman & Seidman,* 686 F.2d 449, 456 (7th Cir.1982) (noting in the context of in pari delicto that "[f]raud on behalf of a corporation is not the same thing as fraud against it").

**52.** *In re CBI Holding Co.,* 529 F.3d 432, 453 (2d Cir.2008) (affirming lower court's holding that bankruptcy trustee could sue accounting firm because the culpable fiduciaries' actions were entirely adverse to the bankrupt corporation).

**53.** *AIG I,* 965 A.2d at 827 ("[T]he Complaint is replete with ways in which AIG itself can be thought to have benefited from the fraudulent schemes, even if those benefits turned out to be short-lived once the fraud was discovered."); *see also See Amaysing Techs. Corp. v. CyberAir Commc'ns, Inc.,* 2005 WL 578972, at

Rather, the plaintiffs would have this court embrace an extension of the adverse interest exception to the in pari delicto doctrine that would, in effect, cover more terrain than the rule itself. They do so by grounding their argument in the notion that the top-ranking AIG officials involved in the Fake Reinsurance and Bid–Rigging Conspiracies had an admixture of corporate and personal objectives in mind when they acted. Although the Complaint plainly pleads that AIG's participation in each of the schemes resulted in tangible (if eventually short-lived) benefits to the corporation in the form of, among other things, higher profits, a guaranteed stream of profitable insurance contracts, a stronger reported balance sheet, and a better stock price, the plaintiffs suggest that the AIG insiders also had personal motives for their actions because they stood to receive greater compensation and chances for promotion if AIG did better. The plaintiffs contend that in these circumstances in pari delicto should give way so that AIG can recover for the harm that it experienced because the corporate action was motivated at least in part by the disloyal interests of AIG's fiduciaries. But, such a "personal interest" exception, if accepted, would gut the in pari delicto doctrine as applied to corporate plaintiffs.

The gutting of the basic rule would result because there is little doubt that in almost every situation where a corporate insider causes a corporation to engage in illegal acts so as to increase the corporation's actual or reported profitability, the insider will have personal interests that might arguably also be advanced if the

illegal scheme succeeds. Here, for example, it is arguable that Hank Greenberg, who was among AIG's largest stockholders and was its CEO, stood to benefit from anything that helped AIG. Senior executives like Matthews and Tizzio also had large stakes in AIG that would increase in value along with AIG.[54] Allowing corporations to sue co-conspirators whenever such an argument can be ginned up would give corporations a gaping exception from the in pari delicto doctrine, putting them on a different plane from actual human beings.

The plaintiffs' proposed "innocent insider exception" would serve the same function, but in a more direct manner. The idea behind this proposed exception is that regardless of what the corporation's agents did, the corporation may have innocent directors and stockholders who, had they known of the illegal schemes, might have acted to prevent them. In such situations, the plaintiffs assert that, because in a hypothetical world such insiders would have quashed the illegal schemes, the corporation should somehow be excused from what actually happened and thus be allowed to sue its own co-conspirators. The effect would be the same as the plaintiffs' personal interest exception: corporations could sue based upon conspiracies in which they knowingly involved themselves. The only support that the plaintiffs have offered for this radical departure is that other courts have, at times, struggled over the application of the doctrine in circumstances involving a cadre of independent directors and stockholders who were not complicit in the misconduct. Therefore, at one point, federal courts applying New

*8 (Del.Ch. Mar. 3, 2005) (holding that allegedly excessive compensation without an allegation that agents were improperly taking all of the benefit of the wrongdoing does not support an inference that agents "were motivated by personal motives divergent from those of the corporation"). The Complaint alleges that AIG insiders participated in the

Fake Reinsurance Conspiracy in order to keep AIG's stock price up. Compl. ¶¶ 266, 268. Likewise, the Complaint alleges that insiders had AIG engage in the Bid–Rigging Conspiracy so as to generate business for AIG. Compl. ¶¶ 89, 346.

**54.** *AIG I,* 965 A.2d at 781–82.

York law were sympathetic to the notion that despite illegal conduct by high-ranking officials, a corporation should be able to recover against third-party co-conspirators as long as the corporation had "innocent insiders" who could have acted to stop the fraud.[55] But that was always a minority view, and the same courts that once applied the innocent insider exception as part of New York law have since indicated that the mere presence of innocent insiders will not allow a corporation to recover from co-conspirators, even co-conspirators like outside auditors specifically hired to and charged with helping to ensure the corporation's law compliance.[56] The policy behind the in pari delicto doctrine, including the need to give corporations a strong incentive to comply with the law, is seen to trump the interests of innocent corporate investors and creditors.[57] Regardless of the details, however, the operative point is that an innocent insider exception, like the plaintiffs' personal interest exception, would allow corporations to sue their own co-conspirators for actions that were undertaken, at least in part, for the corporation's own interest, giving corporations rights that natural persons do not have.

Frankly, I do not perceive the policy justification for such exceptionalism in either instance. When individuals violate the positive law for personal gain, we do not exempt them from the in pari delicto doctrine. The reality is that corporations must act through human beings. When those human beings seek to increase corporate profits by causing the corporation to engage in illegal conduct, the corporation is responsible to innocent third parties. Although not pleasant for stockholders, this corporate liability is essential to the continued tolerance of the corporate form, as any other result would lack integrity.

And, in seeking to give corporations broad immunity from in pari delicto, the plaintiffs slight an important insight that undergirds the in pari delicto doctrine: engaging in the type of accounting which the plaintiffs advocate would be inefficient. And practicality matters in corporate and commercial law.

This case provides an easy illustration of why accountings between wrongdoers are inefficient. AIG is alleged to have conspired in various ways with three separate large corporations: ACE, Marsh & McLennan, and Gen Re. Given that the Complaint pleads that each of the conspiring corporations had its own business motives for conspiring, there is no justifiable basis for giving AIG sole "victim" status.

55. See, e.g., Wechsler v. Squadron, Ellenoff, Plesent & Sheinfeld, L.L.P., 212 B.R. 34, 36 (S.D.N.Y.1997) (holding that a corporation may sue for fraud that the corporation's officers engaged in as long as all of the corporation's shareholders and decisionmakers were not involved in the fraud).

56. In re CBI Holding, Co., 311 B.R., 350, 373 (S.D.N.Y.2004) ("Thus, unless the adverse interest exception to the presumption of imputation applies, it is immaterial whether innocent insiders exists; the agent is still acting on behalf of the company, and his actions will be imputed to the company notwithstanding the existence of those innocent insiders."), rev'd on other grounds, 529 F.3d 432, 447 n. 5 (2d Cir.2008) (referring to the district court's analysis as "extremely persuasive"). Under the court's analysis in CBI, there never actually was a freestanding innocent insider exception, it was simply an exception to the so-called "sole actor rule" which is itself an exception to the adverse interest exception. CBI Holding, 311 B.R. at 373.

57. In re Bennett Funding Group, Inc., 336 F.3d 94, 100–01 (2d Cir.2003) (holding that, based on the same policy interests as are reflected in the in pari delicto doctrine, corporate trustees do not have standing under New York law to bring a claim against an auditor who was allegedly negligent in not uncovering fraud perpetrated by corporate insiders).

In other words, if AIG can recover, so can ACE, Marsh and Gen Re. In fact, if this action could go forward, the only rational course of action for those large corporations would be to bring counterclaims against AIG and then assert similar claims against each other.[58] To be "fair" in some admittedly imprecise way, the court would have to look at each of the corporate wrongdoers, examine how, why, and through whom each committed illegal acts, and then come to some ultimate determination of how costs should be shifted among the conspirators. That is, in an actual battle of comparative fault among conspirators, Marsh and ACE (or derivative plaintiffs acting on their behalf) would turn on AIG and say that if monies need to change hands, it comes our way as AIG got more of the take from the scheme relative to its harms. After all, Marsh might say, we paid out $850 million and AIG only paid $375 million. And, ACE might cry that it, rather than AIG, "lost" the most insurance business by illegally dividing up the market.

Compounding this practicality problem is the plaintiffs' desire to sue individuals who worked for the other corporate conspirators. Although the plaintiffs now concede that only one of these individuals is subject to jurisdiction in Delaware, they originally sued some twenty-two high-level employees of ACE, Marsh, and Gen Re. If AIG's claims against the Third–Party Defendants could proceed, then ACE, Marsh and Gen Re would have a rational incentive to sue both AIG and the myriad of AIG managers who purportedly partici-

pated in the Conspiracies, resulting in a migraine-inducing mess. Unless such suits are to be oddly one-sided, the court would also have to give individual defendants the right to sue the corporate co-conspirators and other individuals based on principles of comparative fault.

At the core of such a proceeding would be the determination of who "won" or "lost" from a criminal conspiracy, a determination fraught with uncertainty and requiring the court to consider what might have happened had the parties not engaged in the behavior they did. Although each of these corporations has itself suffered the consequences of its involvement in the illegal conduct, each may also have profited from its involvement in that conduct. By way of example, the participants in the Bid–Rigging Conspiracy are alleged to have obtained certain insurance accounts free from competition. How calculating, for example, whether, after all is said and done, AIG, Marsh, or ACE was worse or better off from engaging in the Bid–Rigging Conspiracy would be a formidable task to accomplish in a reliable manner. And, all of the individual defendants likely have complicated benefits (promotions and raises) as well as detriments (criminal charges and reputational harm) that the court would have to weigh in determining who was most harmed by the parties' illegal conduct. The in pari delicto doctrine has long acted as a bar to these ponderous inquiries.

Adhering to a more traditional approach to in pari delicto yields a more productive and efficient result.[59] Under that ap-

**58.** This is not just a hypothetical reality. Marsh & McLennan stockholders have already brought a derivative suit in this court against Hank Greenberg and AIG seeking to make AIG and Hank Greenberg pay for the harm Marsh suffered in the Bid–Rigging Conspiracy.

**59.** One also cannot ignore the potent public enforcement that exists as to many important laws that regulate businesses. Society does not need to weaken the in pari delicto doctrine to ensure that Marsh & McLennan, Gen Re, and ACE face consequences for their illegal actions. Public authorities exist to enforce those laws and press claims against wrongdoers according to their accountability,

proach, AIG is free to go after its own directors, officers, and employees for any harm they caused to AIG in the Fake Reinsurance and Bid–Rigging Conspiracies. This promotes accountability by permitting AIG's innocent stockholders and creditors some hope of recompense for the improper conduct that caused their corporation to break the law and suffer damage.[60]

But, consistent with the notion that co-conspirators will be left where they are, the summing up of accounts will only occur within each conspiring corporate family. AIG and its corporate constituencies must live with the consequences of having had a corporate governance structure that permitted managers to enmesh AIG in the Fake Reinsurance and Bid–Rigging Conspiracies. AIG cannot seek to have this court convene a proceeding whereby the comparative fault of AIG and its corporate conspirators, Marsh, ACE, and Gen RE, is

considered, and the court renders a normative and economic judgment about how the spoils and costs of illegal conduct should be shared. The social utility of such a proceeding seems non-existent. Indeed, authorizing such a proceeding would seem to dampen the incentive for institutional investors, corporate creditors, and corporate directors and officers to ensure that corporations have a strong law compliance ethos and diligent law compliance monitoring programs in place. Although no large corporation can have an absolutely effective approach to law compliance, holding out the prospect that corporations may seek recompense from third-party corporate co-conspirators[61] if an illegal scheme goes awry would be counterproductive.

Therefore, I find that the in pari delicto doctrine requires that the claims by AIG against the Third–Party Defendants be dismissed.[62]

---

as the large fines paid by all these conspirators and the criminal prosecutions of several of the individuals involved illustrate. Indeed, a strong argument has been made, which I need not reach, that AIG cannot recover from Marsh & McLennan, ACE, or Rivera because AIG settled the claims that the New York Attorney General brought against AIG arising out of the Bid–Rigging Conspiracy. Under New York law, AIG, having secured its own release, is arguably not entitled to sue its co-conspirators for contribution, which arguably is what the plaintiffs are attempting to do. N.Y. GEN. OBLIG. LAW § 15–108(c) (McKinney 2009) ("A tortfeasor who has obtained his own release from liability shall not be entitled to contribution from any other person."). For immediate purposes, what is important is the combination of public enforcement and enforcement within each corporate family seems the optimal approach, and that going beyond that to allow each conspiring corporation to sue the other conspirator corporations for an equitable summing up of their joint inequity would be unwise because it would diminish, not enhance, corporate law compliance incentives and thrust the judiciary into

inefficient proceedings to determine who should get what from a failed conspiracy.

60. Suits against corporate agents like outside auditors are best conceived of as also within the confines of a single corporate conspirator and are consistent with the traditional acceptance of derivative suits against corporate insiders *AIG I*, 965 A.2d at 828 n. 246. Moreover, making sure that gatekeepers comply with their duties would seem to foster, not impede society's interest in corporate law compliance.

61. I need not and do not address the issues implicated in suits brought by parents against their wholly owned subsidiaries, except to note that they present very different policy considerations than are relevant to whether AIG can sue corporations like Marsh, ACE, and Gen Re.

62. Because I find that the plaintiffs' claims are barred by in pari delicto, I need and therefore do not address Gen Re's related defense that the claims against it are barred by the statute of limitations.

## IV. *Conclusion*

For the foregoing reasons, the claims against the Third–Party Defendants (Marsh & McLennan Companies, Inc., Marsh, Inc., Marsh USA Inc., Marsh Placement Inc., ACE, Ltd., ACE USA, ACE INA Holdings, Inc., Susan Rivera, Gen Re Corporation, and General Reinsurance Corporation) are dismissed with prejudice. IT IS SO ORDERED.