# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| PRINCIPAL GROWTH STRATEGIES, LLC, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> AGH PARENT LLC, *et al.*, <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> )    C.A. No. 2019-0431-JTL <br> ) <br> ) <br> ) <br> ) <br> ) |

## MEMORANDUM OPINION ADDRESSING PLEADING-STAGE ARGUMENTS FOR DISMISSAL

Date Submitted: November 30, 2023
Date Decided: January 25, 2024

Brett D. Fallon, FAEGRE DRINKER BIDDLE & REATH LLP, Wilmington, Delaware; Warren E. Gluck, Richard A. Bixter, Jr., HOLLAND & KNIGHT LLP, New York, New York; *Attorneys for Plaintiffs.*

R. Craig Martin, Amy Evans, DLA PIPER LLP (US), Wilmington, Delaware; Ellen E. Dew, DLA PIPER LLP (US), Baltimore, Maryland; Aidan M. McCormack, R. Brian Seibert, Steven M. Rosato, DLA PIPER LLP (US), New York, New York; *Attorneys for Defendants Senior Health Insurance Company of Pennsylvania (in Rehabilitation) and Fuzion Analytics, Inc.*

Paul D. Brown, Joseph B. Cicero, CHIPMAN BROWN CICERO & COLE, LLP, Wilmington, Delaware; Aaron Z. Tobin, Kendal B. Reed, Michael J. Merrick, CONDON TOBIN SLADEK, THORNTON, PLLC, Dallas, Texas; *Attorneys for Defendants BHLN-Agera Corp., BOLN-Agera Corp., and BBLN-Agera Corp.*

A. Thompson Bayliss, April M. Kirby, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Adam J. Kaiser, Elizabeth A. Buckel, ALSTON & BIRD LLP, New York, New York; *Attorneys for Defendants Bankers Conseco Life Insurance Company, Washington National Insurance Company, CNO Financial Group, Inc., and 40|86 Advisors, Inc.*

Joanna J. Cline, Emily L. Wheatley, TROUTMAN PEPPER HAMILTON SANDERS LLP, Wilmington, Delaware; *Counsel for Defendant Universal Life Insurance Company of Puerto Rico.*

**LASTER, V.C.**

Two hedge funds made risky and illiquid investments. When those investments generated losses, the funds faced a liquidity crisis. To secure additional capital, the fund principals formed a reinsurer. The reinsurer entered into agreements with insurers that authorized the reinsurer to invest the insurers' reserves. The reinsurer invested the reserves in the funds' risky and illiquid investments.

The injection of liquidity from the reinsurer provided the funds with some relief and supported payouts to the fund principals. But the risky and illiquid investments continued to perform poorly, and the insurers began to worry about the reinsurer's ability to pay claims. After investigating the reinsurer and its ties to the funds, the insurers wanted their money back. When law enforcement agencies began investigating the fund principals, the insurers became desperate.

Through plaintiff Principal Growth Strategies, LLC (the "Company"), the hedge funds made one investment that turned out well. Facing pressure from the insurers, the fund principals worked with the reinsurer and the insurers to swap nearly worthless investments for the one good investment. They structured a complex transaction that enabled the insurers to recover much of their capital while leaving the Company holding the bag. The reinsurer benefitted as well, and the fund principals benefitted through the reinsurer.

In this action, the Company has sued the various defendants who engineered or participated in the asset-swap transaction. Joint liquidators overseeing the

bankruptcy of one of the hedge funds have sued as well, seeking to assert claims under Cayman Islands law.

All but one of the defendants moved to dismiss the complaint. This decision grants the motions as to one of the claims under Cayman Islands law. Otherwise, the motions are denied.

## I. FACTUAL BACKGROUND

The facts are drawn from the operative complaint, the documents it incorporates by reference, and information subject to judicial notice. At this stage of the case, the complaint's allegations are assumed to be true, and the plaintiffs receive the benefit of all reasonable inferences.

### A. The Platinum Funds And Beechwood

Mark Nordlicht, David Bodner, and Murray Huberfeld were the principals of a hedge fund complex that operated under the trade name "Platinum Partners." In the early 2000s, they formed two hedge funds: Platinum Partners Value Arbitrage Fund L.P. ("Platinum Arbitrage") and Platinum Partners Credit Opportunities Master Fund L.P. ("Platinum Credit"). Each fund consisted of a master fund and several feeder funds (collectively, the "Platinum Funds").

Platinum Management (NY) LLC served as the general partner of the Platinum Funds. Nordlicht served as the managing member of Platinum Management.

The Platinum Funds made risky and illiquid investments. The investments performed poorly, and by 2012, investors were making withdrawal requests. The Platinum Funds faced a liquidity crisis.

2

The principals of Platinum Management (including Nordlicht) saw reinsurance as a solution. Under a reinsurance relationship, a reinsurer contracts to bear the risks on a group of policies that an insurer cedes to the reinsurer. As part of the transaction, the ceding insurer transfers reserves associated with the ceded policies with the expectation that the reinsurer will manage the reserves and pay the claims. If the reinsurer does not pay the claims, the ceding insurer remains liable to its insureds.

For Platinum Management, the beauty of reinsurance lay in access to investable reserves. Using those reserves, a reinsurer could purchase illiquid Platinum-sponsored investments. The capital infusion would relieve the liquidity crisis and prop up the value of the Platinum-sponsored investments. The higher valuations would generate higher fees for Platinum Management.

To implement their scheme, the principals of Platinum Management formed a Bermuda-based reinsurance company called Beechwood International Ltd. ("Beechwood").[1] They planned for Beechwood to target insurance companies that had suffered losses and either needed to increase their reserves or obtain reinsurance.

B.    The Insurers

CNO Financial Groups, Inc. ("CNO") is a Delaware corporation that wrote long-term care policies through three subsidiaries: Bankers Conseco Life Insurance Company ("Bankers Conseco"), Washington National Insurance Company

---

[1] Beachwood's affiliates include Beechwood Re Ltd. and Beechwood Omnia Ltd.

3

("Washington National"), and Senior Health Insurance Company of Pennsylvania ("SHIP"). The policies were based on actuarial assumptions that proved incorrect. As actual and projected claims mounted, the insurers needed to increase their reserves or secure reinsurance. They had difficulty doing either.

In 2008, CNO placed SHIP in runoff and transferred its equity to the Senior Healthcare Oversight Trust ("Oversight Trust"). After the transfer, SHIP's financial condition continued to deteriorate. Bankers Conseco and Washington National also fared poorly.

In 2012, the Oversight Trust authorized SHIP's management team to form a new affiliate, Fuzion Analytics, Inc., that would manage SHIP's business and provide advisory services to other distressed insurers. All of SHIP's management and employees moved over to Fuzion. CNO did something similar by forming 40|86 Advisors, Inc. as a subsidiary to manage Bankers Conseco and Washington National.

In 2013, 40|86 Advisors turned to Beechwood to obtain reinsurance for Bankers Conseco and Washington National. At the time, Beechwood was a nascent reinsurance company, and the initial meetings took place in Platinum Management's offices. The Beechwood team consisted of Platinum Management employees led by David Levy, the twenty-eight-year-old nephew of Huberfeld, one of Platinum Management's principals.

Bankers Conseco and Washington National executed reinsurance agreements that ceded substantial blocks of policies to Beechwood along with the associated reserves. Bankers Conseco ceded $196 million of reserves and paid $198 million in

4

cash to Beechwood. Washington National ceded $357 million of statutory reserves and paid $394 million in cash to Beechwood.

Because Beechwood was an offshore reinsurer, Beechwood created onshore reinsurance trusts to manage the assets it received and pay out claims as they came due. In 2014, the trustee for the onshore reinsurance trusts hired Fuzion to administer their policies. Through that engagement, Fuzion learned about the reinsurance agreements with Beechwood.

Fuzion was still managing SHIP's insurance business, and SHIP needed to increase its reserves. Fuzion thought that Beechwood could provide a solution. Later in 2014, Fuzion caused SHIP to enter into several investment management agreements that gave Beechwood the discretion to manage SHIP's reserves. Under those agreements, Beechwood guaranteed SHIP an annual return of 5.85% on the net value of the assets Beechwood invested. If actual returns fell short of that mark, then Beechwood was obligated to make up the difference. If actual returns exceeded that mark, then Beechwood kept the upside. Fuzion caused SHIP to place $270 million in accounts for Beechwood to manage.

The Universal Life Insurance Company of Puerto Rico ("ULICO") was another life insurance company that found itself in financial distress and turned to Beechwood for reinsurance. ULICO entered into a reinsurance agreement with an off-shore Beechwood affiliate and ceded policies and associated reserves to that affiliate. As with the relationships established by Bankers Conseco and Washington National, the investable reserves were placed in a reinsurance trust.

## C.     The Investments

Beechwood used the reserves and SHIP's assets to engage in transactions with the Platinum Funds or purchase investments sponsored by Platinum Management. As compensation, Beechwood received profit interests in the investments.

The investments provided the Platinum Funds with liquidity and supported inflated valuations for their assets, which led to higher fees for Platinum Management and more money for its principals. But the investments meant that the reinsurance trusts and SHIP ended up owning illiquid and poorly performing investments sponsored by Platinum Management.

The insurers soon became concerned about the investments Beechwood made. By mid-2014, the insurers were asking questions and contending that some of the investments violated insurance regulations. By the end of 2014, the insurers wanted new personnel managing their investments. Internally, the insurers discussed how to unwind their agreements with Beechwood. During 2015, the insurers became more assertive.

## D.     The Federal Investigations

In March 2016, Platinum Management and its affiliates learned that the United States Attorney's Office for the Southern District of New York was investigating the firm's relationship with Beechwood. In April 2016, *Reuters* published an article about the investigation. The insurers discussed the article and its implications.

On June 7, 2016, the United States Attorney's Office for the Eastern District of New York issued grand jury subpoenas to Bodner and Levy. The next day

witnessed a flurry of subpoenas. The United States Attorney's Office for the Eastern District of New York issued a grand jury subpoena to Platinum Management. The United States Attorney's Office for the Southern District of New York issued grand jury subpoenas to Bodner, Levy, and Platinum Management. The SEC served a subpoena of its own on Platinum management. The day culminated in Huberfeld's arrest. The FBI searched Beechwood's offices, interviewed employees, and seized Huberfeld's computer. On June 22, the FBI searched Platinum Management's offices.

## E.    The Agera Note

As those events unfolded, the insurers confronted the fact that a firm under criminal investigation had invested the reserves securing their policies in poorly performing and illiquid investments. The insurers wanted their reserves back.

The insurers' desire to extract whatever they could from the sinking ship aligned with the interests of Platinum Management's principals, who were also Beechwood's principals. They too wanted to extract whatever value they could.

The solution was to swap lots of bad assets for one good one. The Platinum Funds had made one high-risk investment that actually turned out well. Agera Energy LLC was a promising energy company created through a bankruptcy reorganization in 2013. The Platinum Funds created the Company and caused it to acquire a promissory note convertible into approximately 95% of the equity in Agera Energy (the "Agera Note"). The Company was a shell. It had no employees of its own. Nordlicht signed its operating agreement as its managing member. Platinum Arbitrage owned 55% of its member interest, and Platinum Credit held the rest.

7

Agera prospered, and the value of the Agera Note increased. By 2016, Agera was worth $210 million to $330 million. That meant the Agera Note was worth $200 million to $315 million.

## F. The Agera Transaction

In March 2016, as the federal investigators closed in, Nordlicht proposed to sell the Agera Note to a Beechwood-led consortium of investors (the "Agera Transaction"). Nordlicht and his Platinum Management colleagues would participate in the consortium as buyers.

Nordlicht would only sell to the consortium. When a strategic acquirer asked about Agera, Nordlicht said it was not for sale.

The negotiations took place between affiliates without any protective devices. David Steinberg, Platinum Management's Chief Risk Officer, represented the Company. Dhruv Narain, Beechwood's Chief Investment Officer, represented the consortium. The negotiations were one sided. At one point, when discussing the non-cash consideration that the consortium would pay, Steinberg told Narain: "I'm sorry but a feel like I'm totally being. . . taken advantage of and this is not in good faith."

Meanwhile, the insurers were clamoring about red flags associated with Beechwood's investments. When they demanded their reserves back, Beechwood invited them to participate in the Agera Transaction.

As the first step in the Agera Transaction, Beechwood created a new Delaware limited liability company named AGH Parent LLC. Next, under a subscription agreement, SHIP and the reinsurance trusts selected virtually worthless interests in

Platinum-sponsored investments and assigned them to AGH Parent. In return, they received member interests in AGH Parent.

Beechwood engaged in a similar exchange. Beechwood formed three corporations (the "Beechwood-Agera Corporations") and transferred its profit interests in Platinum-sponsored investments to those entities.[2] Beechwood also transferred worthless investments from the ULICO reinsurance trust to those entities. Like the insurance companies, the Beechwood-Agera Corporations transferred interests in Platinum-sponsored investments to AGH Parent. In return, they received member interests in AGH Parent.

Having moved poorly performing Platinum-sponsored investments into AGH Parent, the second step of the Agera Transaction moved them into the Company. Under a purchase agreement between the Company and AGH Parent, the Company sold the Agera Note to AGH Parent in return for a package of securities ostensibly valued at $170 million. That valuation already represented a significant discount to the fair market value of the Agera Note, which was $200 to $300 million. Regardless, the assets that the Company received were not worth anywhere close to $170 million. Only $65,293,540 was in cash. The next $43,666,460 consisted of poorly performing debt and equity investments in Platinum-affiliated entities that AGH Parent had received in the first step of the transaction. The final $61,040,000 consisted of junior

_____

[2] The Beechwood-Agera Corporations are BHLN-Agera Corp., BOLN-Agera Corp., BBLN-Agera Corp.

9

equity interests in AGH Parent: 3,438 Class B-2 Units valued at $2 million and 590,400 Class C Units valued at $59,040,000.

The Class C Units were another way for Beechwood, SHIP, and the reinsurance trusts to increase their ownership in the Agera Note. Under AGH Parent's operating agreement, AGH Parent had the right to redeem 354,000 of the Class C Units for more poorly performing debt and equity investments. With 354,000 Class C Units no longer outstanding, the proportionate ownership of the other holders of AGH Parent's equity would increase.

The Agera Transaction was not supposed to close until August 2016, but as the investigations intensified, the closing date was pushed up. On June 9, 2016, one day after Huberfeld was arrested, the Agera Transaction closed. Huberfeld later pled guilty to federal charges of conspiracy to commit wire fraud.

On October 28, 2016, AGH Parent exercised its right to redeem the Class C Units that the Company had received. Between November 2016 and January 2017, Beechwood, SHIP, and the reinsurance trusts selected additional Platinum-related investments and assigned them to AGH Parent to use as the consideration for the redemption. In January 2017, AGH Parent completed the redemption, thereby stuffing more bad Platinum-related investments into the Company, reducing the value of the consideration that the Company received for the Agera Note, and increasing the relative equity stakes that Beechwood, SHIP, and the reinsurance trusts owned in AGH Parent.

**G.     The Insurers Sever Ties With Beechwood.**

After the Agera Transaction closed, the insurance companies cut a deal with Beechwood to exchange their remaining interest in Platinum-sponsored investments for additional interests in AGH Parent. As part of that process, CNO retained a forensic examiner to evaluate the Agera Transaction. The examiner summarized the deal as an exchange of bad debt (the Platinum-related investments) for good debt (the Agera Note).

**H.     Beechwood And Certain Reinsurance Trusts Sell Their Interests In AGH Parent.**

In September 2017, Beechwood and  the reinsurance trusts affiliated with the Bankers Conseco, Washington National, and CNO sold their interests in AGH Parent to a third party. The price corresponded to a $230 million valuation for Agera Energy.

**I.     This Litigation**

The Company and joint liquidators of Platinum Arbitrage filed this action in June 2019. The joint liquidators are attempting to assert claims on behalf of Platinum Arbitrage. No one questions that the joint liquidators have the authority to cause Platinum Arbitrage to assert claims, so this decision refers simply to Platinum Arbitrage.

The currently operative complaint contains six counts.

- In Count One, the Company asserts that the Agera Transaction constituted a breach of fiduciary duty by Platinum Management and Nordlicht and that the defendants aided and abetted those breaches of duty.

- In Count Two, the Company asserts that the defendants were unjustly enriched through the Agera Transaction.

11

- In Count Three, the Company asserts that the defendants who received member interests in AGH Parent breached the implied covenant of good faith and fair dealing that inheres in the operating agreement of AGH Parent.

- In Count Four, Platinum Arbitrage asserts a claim under Cayman Islands law for fraudulently trading.

- In Count Five, Platinum Arbitrage asserts a claim under Cayman Islands law to void fraudulent transfers and recover property from AGH Parent.

- In Count Six, the Company and Platinum Arbitrage seek the remedy of a constructive trust.

The defendants have moved to dismiss all of the counts of the complaint except Count Five. This decision therefore does not address Count Five.

The court previously stayed all claims against SHIP in deference to an insurance company liquidation proceeding in Pennsylvania. *See Principal Growth Strategies, LLC v. AGH Parent LLC*, 288 A.3d 1138 (Del. Ch. 2023). This decision does not address any claims against SHIP.

## II.    LEGAL ANALYSIS

The defendants have moved for dismissal under Rule 12(b)(6). When considering such a motion, the court (i) accepts as true all well-pled factual allegations in the complaint, (ii) credits vague allegations if they give the opposing party notice of the claim, and (iii) draws all reasonable inferences in favor of the plaintiffs. Dismissal is inappropriate "unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances." *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011).

**A.     Choice of Law**

As a threshold matter, 40|86 Advisors, Bankers Conseco, Washington National, and CNO (the "CNO Defendants") argue that New York law governs the claims for aiding and abetting and unjust enrichment.[3] To the contrary, Delaware law governs both claims.

To determine what law governs, Delaware applies "the most significant relationship test from the Restatement (Second) of Conflict of Laws." *UbiquiTel Inc. v. Sprint Corp.*, 2005 WL 3533697, at *3 (Del. Ch. Dec. 14, 2005) (cleaned up). The analysis calls for analyzing multiple factors. Restatement (Second) of Conflict of Laws § 145(1) (Am. L. Inst. 1971), Westlaw (database updated Oct. 2023) (the "Restatement of Conflicts").

**1.     Delaware Law Governs The Aiding And Abetting Claim.**

An aiding and abetting claim is a tort claim. It seeks to impose secondary liability for knowing participation in a breach of fiduciary duty, which is an equitable tort. *In re Rural Metro Corp.*, 88 A.3d 54, 98 (Del. Ch. 2014). Both are claims that relate to the internal affairs of an entity, and under the internal affairs doctrine, the chartering state has the greatest interest in those claims. Delaware is the chartering state, and its law controls. *In re Am. Int'l Gp., Inc.* (*AIG I*), 965 A.2d 763, 817, 822 (Del. Ch. 2009), *aff'd sub nom. Tchrs.' Ret. Sys. of La. v. PricewaterhouseCoopers LLP,*

---

[3] They also say that New York law governs the claim for a constructive trust. As discussed below, a constructive trust is a remedy, and there is no need to consider remedies at the pleading stage. This decision therefore does not reach any choice of law issues associated with the request for a constructive trust.

11 A.3d 228 (Del. 2011) (citing *Draper v. Paul N. Gardner Defined Plan Tr.,* 625 A.2d 859, 865 (Del.1993)); *see also Hamilton P'rs, L.P. v. Englard,* 11 A.3d 1180, 1211–12 (Del. Ch. 2010); *Shandler v. DLJ Merch. Banking, Inc.,* 2010 WL 2929654, at *19 (Del. Ch. July 26, 2010).

In a footnote, the CNO Defendants argue that the internal affairs doctrine does not apply because the alleged tortfeasors aided and abetted fiduciary breaches by entering into contracts and engaging in acts "*external* to the corporation are at issue." CNO Defendants Reply Br. at 19 n.14. A claim for breach of fiduciary duty often will have an external component, such as a transaction agreement, and the external component often gives rise to the aiding and abetting claim. *See New Enter. Assocs. 14, L.P. v. Rich (NEA I),* 292 A.3d 112, 175–76, 178 (Del. Ch. 2023). That does not change the choice of law analysis. *See Shandler,* 2010 WL 2929654, at *19. Delaware law governs.

## 2. Delaware Law Governs The Unjust Enrichment Claim.

Delaware law also governs the claim for unjust enrichment. The Restatement of Conflicts calls for a court to consider the following factors when determining what law applies to an unjust enrichment claim:

> (a) the place where a relationship between the parties was centered, provided that the receipt of enrichment was substantially related to the relationship,
>
> (b) the place where the benefit or enrichment was received,
>
> (c) the place where the act conferring the benefit or enrichment was done,
>
> (d) the domicil[e], residence, nationality, place of incorporation and place of business of the parties, and

(e) the place where a physical thing, such as land or a chattel, which was substantially related to the enrichment, was situated at the time of the enrichment.

Restatement of Conflicts § 221 (formatting added). Comment d to Section 221 clarifies that "[w]hen the enrichment was received in the course of the performance of a contract between the parties, . . . [t]he applicable law will be that chosen by the parties if they have made an effective choice under the circumstances stated in [Section] 187." *Id.*

The source of the alleged unjust enrichment is the Agera Transaction. The various agreements governing the Agera Transaction all have Delaware choice of law provisions. The subscription agreements under which Beechwood and the reinsurance trusts contributed investments and received Agera interests have Delaware law choice of law provisions. So does the purchase agreement under which AGH Parent acquired the Agera Note. So does AGH Parent's LLC agreement. So does the trust agreement between ULICO, Wilmington Trust, and Beechwood that governs the ULICO reinsurance trust.

Delaware law therefore governs the unjust enrichment claim unless (i) Delaware lacks a substantial relationship to the parties or the transaction or (ii) applying Delaware law will offend a fundamental policy of a state with a materially greater interest. Neither is the case.

Delaware has a substantial relationship to the parties and the transaction at issue. This case centers around a Delaware LLC (the Company) transferring an interest in a Delaware LLC (Agera Energy) to a Delaware LLC (AGH Parent). Most

of the other defendants are Delaware entities, including Fuzion, CNO, 40|86 Advisors, the Beechwood-Agera Corporations, and the reinsurance trusts.

No state has a materially greater interest than Delaware. Various participant entities are domiciled in New York, Pennsylvania, Indiana, the Cayman Islands, Bermuda, and Puerto Rico, but there is no other critical mass of entities similar to Delaware's plurality. There are contacts with New York that give it a meaningful interest in the scheme, but not an interest that is materially greater than Delaware's.

Applying Delaware law comports with broader factors that govern a choice of law analysis. When a more specific section does not apply, the Restatement of Conflicts instructs a court to consider:

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

Restatement of Conflicts § 6 (formatting added). Applying Delaware law to the unjust enrichment claim based on the choice of law provisions in the related agreements fulfills the expectations of the parties and increases the certainty, predictability, and uniformity of the choice of law result. Delaware law applies to the unjust enrichment claim.

16

**B.    Count One: Aiding and Abetting Breaches Of Fiduciary Duty**

In Count One, the Company contends that the defendants aided and abetted breaches of fiduciary duty by Platinum Management and Nordlicht. Under Delaware law, the claim has four elements: (i) the existence of a fiduciary relationship, (ii) a breach of the fiduciary's duty, (iii) knowing participation in the breach by the non-fiduciary defendants, and (iv) damages proximately caused by the breach. *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001). The complaint pleads all of the requisite elements, and Count One states a claim on which relief can be granted.

**1.    A Fiduciary Relationship**

The first element of the claim is the existence of a fiduciary relationship. The managing member of a limited liability company owes fiduciary duties unless the operating agreement limits or eliminates them. 6 *Del. C.* § 18–1101(c); *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 661 (Del. Ch. 2012). Any language restricting or eliminating fiduciary duties must be explicit and clear. *Feeley*, 62 A.3d at 664; *Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC*, 2009 WL 1124451, at *9 (Del. Ch. Apr. 20, 2009). Unless a limited liability company agreement provides otherwise, a party that controls the managing member owes the same fiduciary duties as the managing member. *Feeley*, 62 A.3d at 667–68.

The Company's limited liability company agreement (the "LLC Agreement" or "LLCA") establishes the following governance regime:

> Management of the Company shall be vested in all of the Members who shall also serve as Operating Managers of the Company. The Operating Managers shall vote in proportion to their Membership Interests in the Company. Except as otherwise provided in this Agreement, all decisions of the Operating Managers shall be by a majority in interest of the

Members. All Operating Managers must be Members of the Company. No Member will take part in or interfere in any manner with the conduct or control of the business of the Company or have any right or authority to act for or bind the Company except as provided in this Agreement.

LLCA § 5.1. The LLC Agreement later states that "[t]he Company shall by [*sic*] managed by the Operating Managers and the conduct of the Company's business shall be controlled and conducted solely and exclusively by the Operating Managers in accordance with this Agreement." *Id.* § 5.4.

Under this governance regime, the Operating Managers are managing members who owe fiduciary duties. The only members of the Company are the Platinum Funds. At the pleading stage, it is reasonable to infer that both were Operating Managers. Both owed fiduciary duties.

The complaint alleges that Platinum Management was the general partner of the Platinum Funds. As the party that controlled the Platinum Funds, Platinum Management owed fiduciary duties.

The complaint alleges that Nordlicht was the managing member of the Company. Under the terms of the LLC Agreement, that does not seem possible, because Nordlicht was not a member of the Company, and only members could serve as Operating Managers. Nevertheless, Nordlicht signed the LLC Agreement on behalf of the Company in his capacity as "Managing Member." At the pleading stage, the court must credit that Nordlicht was the "Managing Member" of the Company, as he represented. He therefore owed fiduciary duties. It is also reasonably conceivable that Nordlicht owed duties to the Company as the managing member of Platinum Management.

18

The defendants argue that Platinum Arbitrage was a passive investor who did not owe fiduciary duties. The LLC Agreement defeats that contention. Platinum Arbitrage held a 55% membership in the Company, making it a controlling member. Regardless, under the LLC Agreement, both members exercised managerial authority as Operating Managers. Both owed fiduciary duties.

The defendants also argue that only a party to the LLC Agreement could owe fiduciary duties, and they note that Platinum Management is not a party to the LLC Agreement. But while equity starts with the *de jure* fiduciary, equity also reaches the party that controls the *de jure* fiduciary.[4] Fiduciary duties do not depend for their existence on party consent; they arise based on the parties' status and the nature of the relationship. A contract may establish a relationship that has a fiduciary character, but a contract is neither necessary nor dispositive.[5] The fact that Platinum Management and Nordlicht are not parties the LLC Agreement does not prevent them from owing fiduciary duties.

---

[4] *See Feeley*, 62 A.3d at 668; *In re USACafes, L.P. Litig.*, 600 A.2d 43, 48–49 (Del. Ch. 1991); *accord Glidepath Ltd. v. Beumer Corp.*, 2019 WL 855660, at *18 (Del. Ch. Feb. 21, 2019); *Cancan Dev., LLC v. Manno*, 2015 WL 3400789, at *23 (Del. Ch. May 27, 2015) *aff'd*, 132 A.3d 750 (Del. 2016); *In re Atlas Energy Res.*, 2010 WL 4273122, at *10 (Del. Ch. Oct. 28, 2010).

[5] *See, e.g.*, *J. Leo Johnson, Inc. v. Carmer*, 156 A.2d 499, 585–86 (Del. 1959) (rejecting defendant's argument that the parties' relationship was purely contractual, in part, because defendant "was acting as either trustee or agent."); s*ee also New Enter. Assocs. 14, L.P. v. Rich (NEA II)*, 295 A.3d 520, 545–47 (Del. Ch. 2023) (discussing non-contractible aspects of fiduciary relationships).

## 2. Breach Of Fiduciary Duties

The second element of an aiding and abetting claim is a breach of the fiduciary's duty. The duty of loyalty requires that a fiduciary act in the best interests of its beneficiaries.[6] To act loyally, a fiduciary must subjectively believe that the action taken advances the best interests of its beneficiaries.[7] And a fiduciary must in fact pursue the interests of its beneficiaries, rather than succumbing to conflicting or divergent interests. A fiduciary who makes decisions based on private interests violates the standard of conduct. *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939).

The complaint pleads that Nordlicht and Platinum Management breached their duty of loyalty by causing the Company to engage in the Agera Transaction. Through that transaction, the Company harmed itself by transferring its only valuable asset to AGH Parent in return for consideration worth far less. It is reasonable to infer that Nordlicht and Platinum Management engaged in the Agera Transaction to benefit themselves—through Beechwood—and to help the insurers who were clamoring for their money back.

---

[6] *See Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993) ("[T]he duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally.").

[7] *See Stone v. Ritter*, 911 A.2d 362, 369 (Del. 2006) ("A failure to act in good faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation . . . .") (quoting *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 67 (Del. 2006)); *Gagliardi v. TriFoods Int'l, Inc.*, 683 A.2d 1049, 1051 n.2 (Del. Ch. 1996) (Allen, C.) (defining a "bad faith" transaction as one "that is authorized for some purpose other than a genuine attempt to advance corporate welfare or is known to constitute a violation of applicable positive law.") (emphasis removed)).

A fiduciary defendant can avoid a finding of breach by proving a self-interested transaction is entirely fair. *See Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1162 (Del. 1995). At the pleading stage, it is reasonably conceivable that the Agera Transaction was not entirely fair. The complaint supports an inference that the Company transferred an asset worth between $200 and $300 million in exchange for consideration worth far less. The complaint contains detailed factual allegations supporting the inference that the Agera Transaction did not result from a fair process, because it was negotiated between affiliates, under time pressure, and for the purpose of extracting value from the Company.[8]

### 3. Knowing Participation

The most critical element for an aiding-and-abetting claim is knowing participation. A defendant can be secondarily liable for "harm resulting . . . from the tortious conduct of another" if the defendant

  (a) does a tortious act in concert with the other or pursuant to a common design with him, or

  (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or

---

[8] The allegations of the complaint would even support a claim for waste because it is reasonably conceivable that no disinterested person of ordinary business judgment could conclude that the Agera Transaction was beneficial to the Company. *Harbor Fin. P'rs v. Huizenga*, 751 A.2d 879, 893 (Del. Ch. 1999). A claim for waste is a type of claim for breach of fiduciary duty, with waste operating as a means of pleading bad faith. *IBEW Local Union 481 Defined Contribution Plan & Tr. v. Winborne*, 301 A.3d 596, 622 (Del. Ch. 2023) ("Although waste historically was viewed as a type of *ultra vires* act that was beyond a fiduciary's power to take, contemporary Delaware authorities have integrated the concept into the business judgment rule as a means of pleading bad faith.") (citing *In re McDonald's Corp. S'holder Deriv. Litig.*, 291 A.3d 652, 693–94 (Del. Ch. 2023)).

>    (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

Restatement (Second) of Torts § 876 (Am. L. Inst. 1979), Westlaw (database updated Aug. 2023).

Knowing participation "involves two concepts: knowledge and participation." *NEA I*, 292 A.3d at 175. To establish knowledge, "the plaintiff must demonstrate that the aider and abettor had actual or constructive knowledge that their conduct was legally improper." *RBC Cap. Mkts., LLC v. Jervis*, 129 A.3d 816, 862 (Del. 2015) (cleaned up). Under Rule 9(b), a plaintiff can plead knowledge generally; "there is no requirement that knowing participation be pled with particularity." *Dent v. Ramtron Int'l Corp.*, 2014 WL 2931180, at *17 (Del. Ch. June 30, 2014). A complaint need only plead facts supporting a reasonable inference of knowledge. *See id.*; *Wells Fargo & Co. v. First Interstate Bancorp.*, 1996 WL 32169, at *11 (Del. Ch. Jan. 18, 1996) (Allen, C.) ("[O]n the question of pleading knowledge, however, Rules 12(b)(6) and Rule 9(b) are very sympathetic to plaintiffs.").

"When a plaintiff alleges that a third-party acquirer knowingly participated in a breach of fiduciary duty by sell-side [fiduciaries], Delaware law imposes an appropriately high pleading burden because an acquirer is expected to bargain in its own interest." *NEA I*, 292 A.3d at 175. A plaintiff "must plead meaningful facts to support an inference that the acquirer attempted to create or exploit conflicts of interest [of the fiduciary] or otherwise conspired with the [fiduciary] to engage in a fiduciary breach." *Id.*

When a plaintiff alleges an aiding and abetting claim against an affiliate of an allegedly culpable fiduciary, inferring knowing participation is straightforward. *Id.* at 175–77. Knowledge of the breach is imputed to the affiliate because of the culpable fiduciary's control. A common design exists because there is but "a single human mind . . . that both engaged in the breach of duty and caused [the affiliate] to act in support of it." *Id.* at 177.

All of the defendants actually participated in the Agera Transaction, so the real question is whether they had actual or constructive knowledge that the Agera Transaction constituted a breach of duty. For purposes of analysis, the defendants fall into three groups.

The first group is the Beechwood-Agera Corporations. For them, inferring knowing participation is easy. Principals of Platinum Management, including Nordlicht, formed Beechwood and selected its officers, including Narain. Beechwood and its officers formed the Beechwood-Agera Corporations to facilitate the Agera Transaction. Narain negotiated the terms of the Agera Transaction. He knew about the gross disparity in price between the value of the Agera Note and the value of the investments being contributed to AGH Parent. His knowledge is attributable to the Beechwood-Agera Corporations. It is reasonable to infer that the Beechwood-Agera Corporations knowingly participated in the Agera Transaction.

The second group is the CNO Defendants. For them, inferring knowing participation is only marginally more difficult. CNO and 40|86 Advisors actively managed the policies held by Bankers Conseco and Washington National. They also

monitored Beechwood's investing activities. They were involved at every stage of the events that led to the Agera Transaction, from the formation of the reinsurance relationship with Beechwood to the efforts to unwind it. From March through April 2016, executives of the CNO Defendants were directly involved in planning the Agera Transaction. Compl. ¶¶ 390–94. The one-sided nature of the Agera Transaction was readily apparent to any observer, yet the CNO Defendants engaged in the transaction. Those allegations support an inference that the CNO Defendants advocated for the Agera Transaction as a means of minimizing their losses and cutting ties with Beechwood, then knowingly participated in the Agera Transaction to achieve those goals.

The last defendant is Fuzion, which managed SHIP's policies and reserves. After learning about the Beechwood-Platinum relationship and its reinsurance agreements with Bankers Conseco and Washington National, Fuzion caused SHIP to enter into a similar relationship. As the relationship turned sour, Fuzion wanted SHIP's assets back. Fuzion knew the Agera Transaction was structured to do just that. Beechwood made presentations to Fuzion in May 2016 which valued Agera Energy between $227 and $344 million, while showing that the purchase price for the Agera Note would be less than $200 million. *Id.* ¶¶ 151–52. Fuzion then caused SHIP to exchange near-worthless securities for interests in AGH Parent. Later, Fuzion caused SHIP to provide $50 million in financing for the Agera Transaction. Those allegations support an inference of knowing participation in the Agera Transaction.

### 4. Damages

The final element of an aiding and abetting claim is causally related damages. *Malpiede*, 780 A.2d at 1096. Relying on New York authorities, the CNO Defendants argue that the complaint must pled facts supporting an inference that their participation was the proximate cause of the Company's harm.[9] Those authorities do not accurately reflect Delaware law, which requires only a reasonably conceivable inference of causally related harm.

At this stage of the proceeding, it is reasonably conceivable that the Agera Transaction harmed the Company by depriving the entity of its only asset in exchange for consideration worth far less. It is also reasonably conceivable that the CNO Defendants were a driving force behind the transaction. The complaint alleges that as Beechwood's largest client, the CNO Defendants pushed Beechwood to engage in the Agera Transaction for the purpose of extricating the CNO Defendants from their involvement in Platinum-sponsored investments. The CNO Defendants then approved of and participated in the Agera Transaction, despite knowing about the relationship between Beechwood and Platinum Management and the gross disparity

---

[9] Although the standard in *Malpiede* uses the term "proximate cause," that term has a different meaning in Delaware than it does in New York for purposes of an aiding and abetting claim. *Compare RBC*, 129 A.3d at 864 ("Under Delaware law, a proximate cause is one which in natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury and without which the result would not have occurred. Our law has long recognized that there may be more than one proximate cause of an injury. To establish proximate cause, a plaintiff must show that the result would not have occurred 'but for' the defendant's action.") (cleaned up)) *with Vasquez v. H.K. & Shanghai Banking Corp.*, 2019 WL 2327810, at *19 (S.D.N.Y. May 30, 2019) ("Allegations of 'but for' causation are insufficient; an alleged aider and abetter will be liable only where the plaintiffs' injury is a direct and reasonably foreseeable result of defendant's conduct.") (cleaned up)).

25

in value between the Agera Note and the assets that the CNO Defendants contributed to AGH Parent.

Count One states a claim for aiding and abetting breaches of fiduciary duty. The motion to dismiss Count One is denied.

## C. Count Two: Unjust Enrichment

In Count Two, the Company asserts a claim for unjust enrichment. To state a claim for unjust enrichment a plaintiff must prove: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, and (4) the absence of justification. *Garfield v. Allen*, 277 A.3d 296, 341 (Del. Ch. 2022). The absence of a remedy at law "is required only if an unjust enrichment claim is brought in the Court of Chancery and there is no other independent basis for equitable jurisdiction." *State v. Monsanto Co.*, 299 A.3d 372, 391 (Del. June 22, 2023). Here, the claim for aiding and abetting a breach of fiduciary duty provides a basis for equitable jurisdiction. The complaint pleads all the other elements, so Count Two states a claim on which relief can be granted.

### 1. An Enrichment

The first element is an enrichment. The complaint alleges that the Beechwood-Agera Corporations received valuable interest in AGH Parent in exchange for consideration worth far less.

The complaint pleads facts which support a reasonable inference that CNO, Bankers Conseco, Washington National, and ULICO were unjustly enriched because the Agera Transaction allowed them to swap interests in poorly performing Platinum-sponsored investments for valuable interests in AGH Parent. The complaint pleads

26

that 40|86 Advisors and Fuzion were unjustly enriched because they were paid by entities that benefitted from the Agera Transaction, which therefore inured to their benefit. That is sufficient.

### 2. An Impoverishment

The next element is an impoverishment. Technically, this is not a necessary element. "A person who is unjustly enriched at the expense of another is subject to liability in restitution." Restatement (Third) of Restitution and Unjust Enrichment § 1 (Am. L. Inst. 2011), Westlaw (database updated Oct. 2023). The claim is about unjust enrichment, not impoverishment. *See id.* § 1 cmt. a ("[T]he consecrated formula 'at the expense of another' can also mean 'in violation of the other's legally protected rights,' without the need to show that the claimant has suffered a loss.").

Regardless, the Company suffered an impoverishment. It received a combination of consideration that was inferably worth far less than the Agera Note.

### 3. A Relationship Between The Impoverishment And The Enrichment

The third element calls for a relationship between the impoverishment and the enrichment. Because an impoverishment is not strictly necessary, a relationship between the impoverishment and the enrichment is also not strictly necessary. Instead, a plaintiff can plead and later prove "a relationship between the challenged enrichment and an invasion of the plaintiff's protected interests." *Garfield,* 277 A.3d at 346.

Here, there is an obvious relationship. The enrichment and the impoverishment are directly linked. One caused the other.

27

### 4. The Absence Of Justification

The fourth element of the claim calls for an absence of justification. The complaint asserts that the defendants engaged in a scheme to enrich themselves rather than suffering the consequences of their decisions. That satisfies this element.

The defendants argue that their benefit cannot be unjustified because they were also victims of a scheme by Platinum Management. Arguments of that sort may play a role at a later phase of the case. They cannot defeat an unjust enrichment claim at the pleading stage.

### 5. The Duplicative Claims Argument

The CNO Defendants argue that the unjust enrichment claim must be dismissed as duplicative of the aiding and abetting claim. "Delaware law . . . permit[s] a plaintiff to simultaneously assert two equitable claims even if they overlap."[10] A plaintiff therefore can assert an aiding and abetting claim and an unjust enrichment claim.[11] Admittedly, the claim for unjust enrichment often adds little and could be

---

[10] *See Frank v. Elgamal*, 2012 WL 1096090, at *11 (Del. Ch. Mar. 30, 2012) (denying motion to dismiss an unjust enrichment claim that defendants argued was duplicative of a fiduciary breach claim because "Delaware law . . . appears to permit a plaintiff to simultaneously assert two equitable claims even if they overlap.") (citing *MCG Cap. Corp. v. Maginn*, 2010 WL 1782271, at *25 n.147 (Del. Ch. May 5, 2010) ("In this case, then, for all practical purposes, the claims for breach of fiduciary duty and unjust enrichment are redundant. One can imagine, however, factual circumstances in which the proofs for a breach of fiduciary duty claim and an unjust enrichment claim are not identical, so there is no bar to bringing both claims against a director.")).

[11] *See Dubroff v. Wren Hldgs., LLC*, 2011 WL 5137175, at *11 (Del. Ch. Oct. 28, 2011); *see also Calma v. Templeton*, 114 A.3d 563, 592 (Del. 2015) (concluding that it was reasonably conceivable the plaintiff could recover on an unjust enrichment claim where it stated a claim for breach of fiduciary duty on the same, "duplicative" allegations); *Delman v. GigAcquisitions3, LLC*, 288 A.3d 692, 729 (Del. Ch. 2023) (observing that there is no bar to

duplicative or unnecessary. But that determination need not be made at the pleading stage.[12]

The complaint pleads all of the elements of an unjust enrichment claim. The motion to dismiss Count Two is denied.

## D. Count Three: Breach Of The Implied Covenant

In Count Three, the Company asserts that the defendants who received member interests in AGH Parent breached the implied covenant of good faith and fair dealing when they redeemed the Company's Class C Units. Count Three states a claim on which relief can be granted.

"Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." Restatement (Second) of Contracts § 205 (Am. L. Inst. 1981), Westlaw (database updated Oct. 2023). The Delaware Supreme Court has summarized the implied covenant concisely as follows:

> The implied covenant is inherent in all contracts and is used to infer contract terms to handle developments or contractual gaps that . . . neither party anticipated. It applies when the party asserting the implied covenant proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the

allowing parallel unjust enrichment and fiduciary duty claims to survive a motion to dismiss, but noting that double recovery is prohibited).

[12] *McPadden v. Sidhu*, 964 A.2d 1262, 1276 (Del. Ch. 2008) ("[D]efendants' argument that plaintiff has conflated the unjust enrichment claim and the breach of fiduciary [duty] claim is unavailing. If plaintiff has pleaded and then prevails in demonstrating that the same conduct results in both liability for breach of [defendant's] fiduciary duties and disgorgement via unjust enrichment, plaintiff then will have to elect his remedies. But, at this time, defendants have [ ] wholly failed to satisfy their burden to justify dismissal of this count.").

29

asserting party reasonably expected. The reasonable expectations of the contracting parties are assessed at the time of contracting.

*Dieckman v. Regency GP LP*, 155 A.3d 358, 367 (Del. 2017).

The Delaware Supreme Court has made clear that the implied covenant constrains a party's exercise of discretion under an agreement. The implied covenant generally requires that a party to a contract refrain from arbitrary or unreasonable conduct that has the effect of preventing a counterparty from receiving the fruits of the bargain. That rule operates with special force "when a contract confers discretion on a party." *Glaxo Gp. Ltd. v. DRIT LP*, 248 A.3d 911, 920 (Del. 2021). "At a minimum, the implied covenant requires that the party empowered with the discretion 'use good faith in making that determination.'" *Cygnus Opportunity Fund, LLC v. Wash. Prime Gp., LLC*, 302 A.3d 430, 460 (Del. Ch. 2023). (quoting *Gilbert v. El Paso Co.*, 490 A.2d 1050, 1055 (Del. Ch. 1984), *aff'd*, 575 A.2d 1131 (Del. 1990)).

The Company argues that AGH Parent's operating agreement gave AGH Parent the discretion to select the debt instruments to be exchanged for the Company's Class C Units. Section 9.06 states:

(a) Subject to the terms and conditions set forth in this **Section 9.06**, [AGH Parent] shall have the right at any time to redeem all, or any portion, of the outstanding Class C Preferred Units held by any holder of Class C Preferred Units for a per Unit redemption price equal to (A) the sum of the Class C Preferred Unreturned Capital Value plus the [*sic*] any unpaid Class C Preferred Return calculated as of date of redemption, which sum is divided by (B) the number of outstanding Class C Preferred Units, payable:

(i) *with respect to the Class C Preferred Units held by [the Company],* in the case of a redemption of Class C Units pursuant to a Class C Redemption Notice delivered by [AGH Parent] on or prior to October 31, 2016, *in the form of PGS Value,* with the remainder to be paid in cash; or

30

(ii) in all other cases, in cash.

Compl. Ex. 20 § 9.06(a)(i)–(ii) (fourth and fifth emphasis added). The operating

agreement defines "PGS Value" as

> investments held by [AGH Parent] in Platinum Partners Credit
> Opportunities Master Fund LP, a Delaware limited partnership,
> Platinum Partners Value Arbitrage Fund L.P., an exempted limited
> partnership under the laws of the Cayman Islands, their respective
> shareholders or any of their respective Affiliates, with an approximate
> aggregate value equal to *$35,400,000* of all amounts payable thereunder
> (including principal and interest) . . . . The value attributable to PGS
> Value in connection with Section 9.06 shall be (x) *with respect to debt
> instruments, face value* (including principal and interest) and (y) with
> respect to limited partnership interests, the capital account value as
> carried on the books of the applicable partnership.

*Id.* at 12 (emphasis added).

The Company contends that AGH Parent and the defendants who selected

investments to be used for the redemption had to exercise their discretion so as not

to frustrate the basic purpose of the agreement, which was to provide the Company

with consideration worth $35,400,000. In other words, even though the operating

agreement called for giving qualifying debt instruments their face value, AGH Parent

and the defendants who received member interests in AGH Parent had to select a

package of investments that they reasonably believed was worth the target amount.

They could not intentionally select investments whose value would come nowhere

close to that amount, even if the selected investments were the kind of investment

that the AGH Parent operating agreement permitted them to select. That is the type

of obligation that the implied covenant can supply.

The complaint alleges that the defendants worked with Beechwood and Platinum Management to select debt that they knew to be worthless or nearly so. Compl. ¶¶ 471–477, 521. The Company claims that this exchange of worthless consideration for their membership units robbed the Company of the fruit of its bargain. Those allegations support an implied covenant claim.

Fuzion and the Beechwood-Agera Corporations respond that they were free to contribute any qualifying debt instruments to AGH Parent, regardless of their true worth or collectability, simply because the operating agreement (i) provided that the investments were in the universe of investments that could be selected and (ii) called for valuing the debt instruments at face value. Those specifications do not occupy the field and displace the implied covenant. The choice of which qualifying investments to select was still a matter of discretion. It is therefore reasonably conceivable that Fuzion and the Beechwood-Agera Corporations breached the implied covenant by acting unreasonably.

Count Three states a claim for breach of the implied covenant of good faith and fair dealing upon which relief can be granted. The motion to dismiss Count Three is denied.

## E.    Count Four: Fraudulent Trading Under Cayman Law

In Count Four, the joint liquidators for Platinum Arbitrage asserts a claim for fraudulent trading under Section 147 of the Cayman Islands Companies Act. That effort fails.

Many readers will be familiar with the concept of wrongful trading under English law. That claim asserts that "the directors have continued to operate the

company after the point they knew, or should have known, that there was no reasonable prospect of the company avoiding liquidation." *Quadrant Structured Prods. Co., Ltd. v. Vertin*, 102 A.3d 155, 173 (Del. Ch. 2014) (citation omitted).

Fraudulent trading is a distinct concept more akin to the law governing fraudulent transfers. Section 147 states:

> (1) If in the course of the winding up of the company it appears that any business of the company has been carried on with intent to defraud creditors of the company or creditors of any other person or for any fraudulent purpose the liquidator may apply to the Court for a declaration under this section.

> (2) The Court may declare that any persons who were knowingly parties to the carrying on of the business in the manner mentioned in subsection (1) are liable to make such contributions, if any, to the company's assets as the Court thinks proper.

*Id.* Section 147 thus applies to a company in liquidation under Cayman Islands law and requires that the company have conducted business with the intent to defraud creditors. The liquidators of the company can seek a remedy against anyone knowingly involved in the fraud.

The joint liquidators cannot use Platinum Arbitrage and the Company to assert a Section 147 claim, because the Company is not in liquidation under Cayman Islands law. The defendants have tried to frame this proposition using the concept of standing. Standing "refers to the right of a party to invoke the jurisdiction of a court to enforce a claim or redress a grievance." *Stuart Kingston, Inc. v. Robinson*, 596 A.2d 1378, 1382 (Del. 1991). "Standing is therefore properly viewed as a threshold issue to ensure that the litigation before the tribunal is a 'case or controversy' that is appropriate for the exercise of the court's judicial powers." *Brookfield Asset Mgmt.,*

*Inc. v. Rosson*, 261 A.3d 1251, 1262 (Del. 2021) (cleaned up). A dispute over standing is concerned "only with the question of *who* is entitled to mount a legal challenge and not with the merits or the subject matter of the controversy." *Stuart Kingston*, 596 A.2d at 1382. Thus, "standing does not implicate the court's power to hear a particular claim. It asks whether a particular party can assert it." *Gandhi-Kapoor v. Hone Capital LLC*, --- A.3d ---, ---, 2023 WL 8480970, *7 (Del. Ch. Dec. 4, 2023).

Standing is not the right framework. If the Company could assert a Section 147 claim, then the joint liquidators could cause Platinum Arbitrage to cause the Company to assert it. Platinum Arbitrage is an Operating Manager and owns 55% of the Company's member interests. The joint liquidators control Platinum Arbitrage. Just as they have caused the Company to assert a claim for aiding and abetting breaches of fiduciary duty, they could cause the Company to assert a claim under Section 147.

The joint liquidators respond that they have standing to sue as official Cayman Island liquidators under chapter 15 of the United States Bankruptcy Code. Among other things, that chapter allows a foreign representative of a debtor conducting a liquidation proceeding in another country to sue and be sued in a court in the United States and to apply for appropriate relief in that court. 11 U.S.C. §§ 1509(b), 1521(a); *In re Condor Ins. Ltd.*, 601 F.3d 319, 329 (5th Cir. 2010). That means the foreign representative of a foreign debtor can assert claims on behalf of a foreign debtor.

34

The foreign debtor here is Platinum Arbitrage. If Platinum Arbitrage had a claim under Section 147, then the joint liquidators could cause Platinum Arbitrage to assert it. Instead, they are trying to assert a claim on behalf of the Company.

In substance, the joint liquidators are trying to pierce the Company's entity veil, collapse the separate identities of Platinum Arbitrage and the Company, and then combine Platinum Arbitrage's claim under Section 147 with the injury that the Company suffered from the Agera Transaction.

Delaware law, not Cayman Islands law, governs whether Platinum Arbitrage can achieve this feat. "[T]he separate legal existence of juridical entities is fundamental to Delaware law." *Feeley*, 62 A.3d at 667. "Thus, there exists a presumption of corporate separateness, even when a parent wholly owns its subsidiary and the entities have identical officers and directors." *Wenske v. Blue Bell Creameries, Inc.,* 2018 WL 5994971, at *5 (Del. Ch. Nov. 13, 2018).

A court can override an entity's separate legal existence by piercing the entity veil. That doctrine permits "creditors to reach the assets of the owners of the entity based on a multi-factor test." *Feeley*, 62 A.3d at 667 (citing Robert B. Thompson, *The Limits of Liability in the New Limited Liability Entities,* 32 Wake Forest L. Rev. 1, 9–10 (1997)). In substance, a court can overcome entity separateness so that the sovereign's creation cannot be used to facilitate fraud or similarly wrongful conduct.[13]

---

[13]*See, e.g.*, *In re Verizon Ins. Coverage Appeals*, 222 A.3d 566, 577 (Del. 2019) ("The alter ego doctrine is used to pierce the corporate veil when a corporation has created a sham entity designed to defraud investors and creditors.") (cleaned up); *Crosse v. BCBSD, Inc.*, 836 A.2d 492, 497 (Del. 2003) ("A veil-piercing claim is usually invoked when the shell corporate entity is insolvent and the plaintiff wishes to reach the personal assets of the corporation's

This is not a setting where piercing could apply. The Platinum Funds created the Company as a special purpose vehicle to engage in the Agera bankruptcy and acquire the Agera Note. The Platinum Funds benefitted from the Company's status as a separate entity. The Company was not used to commit a fraud; it appears to have acquired the Agera Note legitimately. Nor did the Company commit a fraud through the Agera Transaction. The Company was a victim of fraud, not a perpetrator. As a 55% owner of the Company, Platinum Arbitrage suffered as well, but indirectly through its equity stake. The proper outcome in this setting is for the Company to assert its own claims, not to disregard the Company's separate entity status to enable the joint liquidators to assert a new, hybrid claim grounded in Cayman Islands law.

Count Four is therefore dismissed. AGH Parent did not move to dismiss Count Four, but because the claim fails in its entirety, the dismissal extends to AGH Parent as well.

## F. *In Pari Delicto*

The CNO Defendants, Fuzion, and ULICO argue even if the complaint could state claims against them, the *in pari delicto* doctrine bars the plaintiffs from asserting those claims through the Company. That argument fails.

"Delaware, like most American jurisdictions and our federal common law (where applicable), embraces to some extent the venerable *in pari delicto* doctrine."

---

stockholders or alter egos."); *Williams v. Lester*, 2023 WL 4883610, at *3 (Del. Ch. Aug. 1, 2023) ("Where a corporate entity exists only as a vehicle for fraud, equity, if required, can pierce the metaphorical veil of limited liability, and, where appropriate, find the principals liable for obligations of the entity.").

*In re Am. Int'l Gp., Inc., Consol. Deriv. Litig. (AIG II)*, 976 A.2d 872, 882 (Del. Ch. 2009) (italics added). Under that doctrine, courts "will not extend aid to either of the parties to a criminal act or listen to their complaints against each other but will leave them where their own act has placed them." *Id.* (quoting 1 Am. Jur. 2d *Actions* § 40, Westlaw (database updated Oct. 2023)). Put differently, "a party is barred from recovering damages if his losses are substantially caused by activities the law forbade him to engage in." *In re LJM2 Co–Inv., LP*, 866 A.2d 762, 775 (Del. Ch. 2004) (cleaned up)). The doctrine reflects a policy judgment that a court should not use its limited resources to resolve fights between co-conspirators over the consequences of their illicit conduct. *See AIG II*, 976 A.2d at 877 ("[T]here is no societal interest in making sure that each party gets its 'fair' share of the conspirators' societally unfair bargain.").

The *in pari delicto* doctrine has exceptions. One is the adverse inference exception, "derived from the same body of agency law imputation principles that gave rise to the *in pari delicto* rule itself." *Stewart v. Wilm. Tr. SP Servs., Inc.*, 112 A.3d 271, 309 (Del. Ch. 2015), *aff'd*, 126 A.3d 1115 (Del. 2015). If an agent acts in a manner adverse to the interests of his principal, the law will not impute the act to the principal, "because it seems nonsensical to presume that a thieving agent would tell his principal about the theft." *Id.*; *accord* Restatement (Third) of Agency § 5.04 (Am. L. Inst. 2006), Westlaw (database updated Oct. 2023). For purposes of *in pari delicto*, if a party acts "solely to advance his own personal financial interest, rather than that of the corporation itself, the adverse interest exception comes into play and permits

37

the corporation to state a claim[.]" *Stewart*, 112 A.3d at 309 (cleaned up). "In that unusual context, it can be said that the corporation, although responsible to innocent third parties and the polity for any offense to them, is more conspired against than a conspirator." *AIG II*, 976 A.2d at 891.

In *AIG II*, the court provided an instructive example:

> To the extent that third parties conspire with the faithless insider in a plan to impoverish the corporation for the benefit of the insider and the other conspirators, courts have held that the doctrine of *in pari delicto* gives way in order to allow recovery from anyone who helped steal from the corporation. For example, where a fiduciary acts with third parties in order to siphon off corporate funds, that fiduciary is not just working for her own benefit, she is acting to harm the corporation. Thus, the corporation should be able to sue the third party that helped the fiduciary harm the corporation.

*Id.* (italics added) (footnote omitted). That is precisely what happened to the Company.

The complaint alleges that the defendants conspired with the Company's fiduciaries to loot the Company so that the defendants could shift their losses to the Company and extract value through the Agera Transaction. The Company's fiduciaries "act[ed] with third parties in order to siphon off corporate funds" and therefore were "not just working for [their] own interest" but "acting to harm" the Company affirmatively.

The defendants respond that the Company benefited from the Agera Transaction because it received $170 million in cash and securities in exchange for the Agera Note. Only a lawyer representing a client could make that argument. For purposes of the motion to dismiss, the court must assume that the Agera Note was worth at least $250 million, so there was zero benefit to the Company in exchanging

38

$250 million for $170 million. "To hold that any amount of cash received is a benefit, even if that cash pales in comparison to the value of the assts for which it was exchanged, would render the term 'benefit' meaningless." *In re Platinum-Beechwood Litig.*, 2019 WL 2569653, at \*13 (S.D.N.Y. June 21, 2019).

Finally, the defendants argue that the "sole actor" exception to the adverse inference exception applies. "Courts have applied the sole actor exception where the agent committing the fraud was the sole stockholder of the corporation, or otherwise 'dominated' the corporation." *Stewart*, 112 A.3d at 310. The sole actor rule "overrides the adverse interest exception where the principal and the agent are the same, because it is absurd to presume that the one actor involved and affected somehow could keep secrets from himself, and because the principal, as the same sole owner, benefits from the fraud." *Id.* at 310–11. Thus, where the faithless fiduciary also solely owns or otherwise dominates the entity, the principal-agent distinction virtually disappears. *See id.* at 311. "In terms of a claim against a third party that dealt with the [entity,] therefore, the adverse interest exception will not aid an agent-principal who does wrong by protecting the [entity] he controls from the effect of *in pari delicto*." *Id.*

The defendants argue that because Platinum Management and its principals formed the Company and managed its affairs, Platinum Management acted as both agent and principal. Applying the sole actor exception makes sense not only because of the theoretical unity of mind, but also because there are no innocent parties on the corporation's side of the equation. When the bad actor owns all of the entity, the bad

39

actor is asserting the entity's claim to benefit itself. But Platinum Management did not own 100% of the Company.

When there are other innocent parties in the mix, applying the sole actor doctrine leaves those innocent parties without a remedy. By asserting an entity-level claim against third parties, the derivative plaintiff recovers value for the benefit of the entity, and that value is distributed to the entity's claimants in order of priority. The entity-level claim may create value for creditors, including involuntary creditors who were injured by the bad actor's scheme. The entity level claim also may create value for innocent equity investors. Applying the sole actor exception whenever a sole actor dominates the affairs of an entity, despite not owning 100% of the entity, would leave those innocent parties without any path to recover. A court of equity can prevent the bad actor from benefiting from its misconduct through more targeted limitations, such as by foreclosing the bad actor from participating in the recovery or by awarding an investor-level recovery that bypasses the bad actor.

It may be that some potentially innocent parties in the capital stack turn out to be not so innocent. The Company's investors were the Platinum Funds. If it turns out that many of the investors in the Platinum Funds were principals of Platinum Management who were themselves culpable participants in the scheme, then any remedy must take that into account. If the Company's investors were third parties who knew about and approved of Platinum Management's aggressive tactics and who benefitted from similar schemes, then they will have to take the bitter with the sweet. A court of equity can address issues of that sort in more nuanced ways.

None of these considerations should be addressed at the pleading stage through expansive, potentially overbroad, claim-terminating rulings. The court can apply the doctrine of *in pari delicto* or its equitable variant—unclean hands—in a more tailored way at a later stage of the case. *In pari delicto* therefore does not bar the plaintiffs' claims at the pleading stage.

## G.    The Pleading Issues

We have almost approached the end of the defendants' multitudinous attacks on the plaintiffs' claims. The last two are a grab bag of criticisms about the specificity of the pleadings. They fall under two headings. None are persuasive.

### 1.    Rule 9(b)

The defendants argue that the complaint fails to plead with particularity as required by Rule 9(b). That rule states that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge and other condition of mind of a person may be averred generally." Ct. Ch. R. 9(b). "The reference to 'circumstances' in the rule is to matters such as the time, place, and contents of the false representations or omissions, as well as the identity of the person making the misrepresentation or failing to make a complete disclosure and what that defendant obtained thereby." 5A Arthur R. Miller et al., *Federal Practice and Procedure* § 1297 (4th ed.), Westlaw (database updated Apr. 2023). But the test of particularity is "not scientific." *Kahn Bros. & Co., Inc. Profit Sharing Plan & Tr. V. Fischbach Corp.*, 1989 WL 109406, at *4 (Del Ch. Sept. 19, 1989). "[T]he plaintiff is required to allege the circumstances of the fraud with

detail sufficient to apprise the defendant of the basis for the claim." *Abry P'rs V, L.P. v. F & W Acq. LLC*, 891 A.2d 1032, 1050 (Del. Ch. 2006).

The parties join issue on whether the counts of the complaint are subject to Rule 9(b). There is good reason to conclude that none of the counts require particularized pleading under Rule 9(b), but this decision passes over that question. Assuming for purposes of analysis that the entire complaint is subject to a particularity standard, the complaint's allegations meet it.

The facts of the complaint put the defendants on notice of the plaintiffs' assertions about the Agera Transaction operating as a scheme to extract value from the Company. The complaint is 130 pages long and contains 582 total paragraphs, including 497 paragraphs of factual allegations. In those nearly 500 paragraphs, the plaintiffs identify who participated in the scheme, how and why the Agera Transaction came about, meetings at which the Agera Transaction was discussed, the terms of the Agera Transaction, the agreements governing the Agera Transaction, and how the defendants benefitted from the Agera Transaction. To say that the defendants do not understand the claims they face is preposterous.

Rule 9(b) does not require a plaintiff to plead every individual fact necessary to prevail at trial. Rule 9(b) certainly does not require pleading the evidence that the plaintiff will present. The detailed complaint more than satisfies the level of particularity that Rule 9(b) contemplates.

### 2. Group Pleading

The defendants next argue that the complaint engages in impermissible group pleading. The defendants contend that the complaint does not spell out allegations

against each individual entity. That is generally true but beside the point. The complaint pleads that the defendants acted as a group because the defendants participated together in the Agera Transaction.

Delaware law does not prohibit group pleading, but the practice is disfavored because Delaware prioritizes the pleading of facts. *See In re Swervepay Acq., LLC*, 2022 WL 3701723, at *9 (Del. Ch. Aug. 26, 2022); *accord River Valley Ingredients, LLC v. Am. Proteins, Inc.*, 2021 WL 598539, at *3 (Del. Super. Feb. 4, 2021). When defendants invoke the doctrine successfully, the case usually involves a claim for breach of fiduciary duty against directors protected by an exculpatory provision, where Delaware law requires that the complaint plead specific facts supporting non-exculpated conduct by each director. *See In re Cornerstone Therapeutics Inc, S'holder Litig.*, 115 A.3d 1173, 1182 (Del. 2015); *accord In re Tangoe, Inc. S'holder Litig.*, 2018 WL 6074435, at *12 (Del. Ch. Nov. 20, 2018). The defendants have gathered a smattering of cases involving that issue, often involving motions to dismiss under Rule 23.1. Those cases address different issues in a different setting. They are inapposite.

In other settings, this court permits plaintiffs to plead that defendants have acted together and to refer to them collectively when describing their actions. *E.g., In re Pattern Energy Gp., Inc. S'holders Litig.*, 2021 WL 1812674, at *58 n.737 (Del. Ch. May 6, 2021). That technique is often warranted for close affiliates, particularly when one entity manages another. *See, e.g., In re WeWork Litig.*, 2020 WL 7343021, at *11 (Del. Ch. Dec. 14, 2020).

The defendants object to the multi-party definitions the complaint uses, but none of those terms raise problems. The term "Beechwood-Agera Corporations" refers appropriately to entities created in parallel as special purpose vehicles to participate in the Agera Transaction. The defendants themselves refer to the entities collectively in the complaint's exhibits.

The same is true for the SHIP Defendants, defined as Fuzion and SHIP. That term is appropriate because SHIP has no employees of its own, and Fuzion managed SHIP's affairs. That means both that Fuzion's actions are attributed to SHIP and that if SHIP acts, then Fuzion inferably caused it to act. The defendants themselves refer to SHIP and Fuzion together in exhibits attached to the complaint.

In response, SHIP and Fuzion cite a decision in related litigation where the court relied on a group pleading argument, stating:

> Fuzion is lumped together with SHIP as the "SHIP Defendants," and Fuzion is broadly mentioned as having "advised" SHIP. The allegations lack particularity as to what and how Fuzion specifically advised SHIP. Essentially, the FAC treats Fuzion and SHIP as interchangeable and identical, when they are separate legal entities with different business functions.

*In re Platinum-Beechwood Litig.*, 427 F. Supp. 3d 395, 454 (S.D.N.Y. 2019). That decision involved a different complaint, different pleading standards, and different claims. Here, the plaintiffs have sufficiently pled facts establishing Fuzion's relationship with SHIP.

## H.    The Remedy Of A Constructive Trust

Not content with moving to dismiss the plaintiffs' claims, Fuzion and the Beechwood-Agera Corporations try to obtain a pleading stage dismissal of a remedy.

They contend the plaintiffs cannot obtain a constructive trust for their unjust enrichment claims because that remedy requires a confidential or fiduciary relationship.

"While courts have listed elements for constructive trusts, it has also been found that no rigid requirements exist for imposing a constructive trust, and any factors considered relevant to the establishment of a constructive trust are simply guidelines, their rigid application not being required." 90 C.J.S. *Trusts* § 176, Westlaw (database updated Aug. 2023). A constructive trust allows the court to treat defendants who hold property as if they were holding it in trust for the plaintiff. Samuel L. Bray, *Fiduciary Remedies*, *in* OXFORD HANDBOOK OF FIDUCIARY LAW 449, 454 (Evan J. Criddle et al. eds., 2019).

A constructive trust is the typical remedy for an unjust enrichment claim when specific property can be identified, regardless of whether or not there was a fiduciary relationship between the parties. *See B.A.S.S. Gp. LLC v. Coastal Supply Co. Inc.*, 2009 WL 1743730, at *7 (Del. Ch. 2009) ("The typical remedy for unjust enrichment is restitution. A constructive trust is simply a form of restitution in specie. . . . If the unjustly obtained funds can be traced into specific property, then a constructive trust can be imposed on the property, regardless of the culpability of the party possessing the property . . . ."); *Tchrs.' Ret. Sys. of La. v. Aidinoff*, 900 A.2d 654, 670 n.22, 671–73 (Del. Ch. 2006) (same). The defendants thus have not provided any basis for rejecting a constructive trust as a potential remedy. The court need not go any further at the pleading stage.

### III. CONCLUSION

The defendants' motions to dismiss under Rule 12(b)(6) are granted as to Count Four. Otherwise, they are denied. Within thirty days, the parties must submit a schedule designed to bring this case to trial within eighteen months.